CA No. 20-99009

IN THE UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

LEZMOND CHARLES MITCHELL,

Defendant-Appellant.

DC No. 3:09-cv-08089-DGC
(Criminal No. 3:01-cr-01062-DGC)

**DEATH PENALTY CASE**

**Emergency Motion Under Circuit Rule 27-3(b)**

**Execution Set For: August 26, 2020 at Time: To Be Determined.**

# APPELLANT'S EMERGENCY MOTION TO STAY EXECUTION

APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF ARIZONA

The Honorable David G. Campbell
United States District Judge

CUAUHTEMOC ORTEGA
Interim Federal Public Defender
JONATHAN C. AMINOFF
Jonathan_Aminoff@fd.org
CELESTE BACCHI
Celeste_Bacchi@fd.org
Deputy Federal Public Defenders
321 East 2nd Street
Los Angeles, California 90012-4202
Tel: (213) 894-5374; Fax: (213) 894-0310
Attorneys for Petitioner-Appellant
LEZMOND CHARLES MITCHELL

## CIRCUIT RULE 27-3 CERTIFICATE

Pursuant to Circuit Rule 27-3(c)(i), the attorneys for the parties are:

**Counsel for Defendant-Appellant, Lezmond Mitchell**

Jonathan C. Aminoff
Celeste Bacchi
Deputy Federal Public Defenders
Office of the Federal Public Defender
321 East Second Street
Los Angeles, CA 90012
jonathan_aminoff@fd.org
celeste_bacchi@fd.org
213-894-5374

**Counsel for Plaintiff-Appellee, United States of America**

William G. Voit
Assistant United States Attorney
Office of the United States Attorney
Two Renaissance Square, Suite 1200
40 N. Central Avenue
Phoenix, AZ 85004
william.voit@usdoj.gov
602-514-7500

**Counsel for the Bureau of Prisons**

Katherine Siereveld
Senior Attorney
FCC Terre Haute
4200 Bureau Road North,
Terre Haute, IN 47802
ksiereveld@bop.gov
812-238-3476

Appellant Lezmond Mitchell is scheduled to be executed on August 26, 2020. The Government intends to execute Mitchell in violation of the Federal Death Penalty Act and the trial court's January 2004 judgment. Circuit Rule 27-3(c)(ii).

This motion is being filed one day after the district court issued the order that is the subject of this appeal. Circuit Rule 27-3(c)(iii).

Counsel for the parties conferred after this matter was submitted in the district court and agreed that an appeal would be promptly filed by the losing party. The parties then notified the Court of their intentions, Mitchell promptly filed a notice of appeal after the district court issued its order, and the Court issued a scheduling order apprising the parties of all developments. Appellee's counsel will be served via the Court's appellate CM/ECF system. Circuit Rule 27-3(c)(iv).

Mitchell sought relief in the district court and now appeals the district court's adverse ruling. Circuit Rule 27-3(c)(v).

# TABLE OF CONTENTS

**Page**


CIRCUIT RULE 27-3 CERTIFICATE .................................................................. i

I. INTRODUCTION .......................................................................................3

II. RELEVANT FACTS AND PROCEDURAL HISTORY ...............................3

III. ARGUMENT...............................................................................................6

A. Relevant factors for a stay of execution ...............................................6

B. All of the factors weigh heavily in favor of granting Mitchell's request for a stay of execution.............................................................8

1. Mitchell presents a substantial case for relief on the merits of his claim that the BOP's noticed execution of Mitchell violates the FDPA and the terms of the district court's 2004 judgment...........................................................................8

2. Mitchell faces the greatest possible irreparable harm...............14

3. The balance of equities favors a stay. .......................................15

4. The public interest favors a stay. ..............................................18

5. Mitchell has not delayed in bringing this motion. .....................18

IV. CONCLUSION.........................................................................................20

# TABLE OF AUTHORITIES

**Page(s)**

## Federal Cases

*Advocate Health Care Network v. Stapleton*,
137 S. Ct. 1652 (2017)....................................................................14

*Al Otro Lado v. Wolf*,
952 F.3d 999 (9th Cir. 2020) ..........................................................20

*Alliance for the Wild Rockies v. Cottrell*,
632 F.3d 1127 (9th Cir. 2011) ........................................................17

*Barr v. Roane*,
140 S. Ct. 353 (2019).......................................................................10

*Barr v. Roane*,
140 S. Ct. 535 (2019).......................................................................17

*Beaty v. Brewer*,
649 F.3d 1071 (9th Cir. 2011) ..........................................................9

*California v. Azar*,
911 F.3d 558 (9th Cir. 2018) ..........................................................21

*Evans v. Bennett*,
440 U.S. 1301 (1979).......................................................................18

*In re Fed. Bureau of Prisons' Execution Protocol Cases*,
955 F.3d 106 (D.C. Cir. 2020)..........................................11, 14, 15, 17

*Matter of Fed. Bureau of Prisons' Execution Protocol Cases*,
No. 12-CV-0782, 2019 WL 6691814 (D.D.C. Nov. 20, 2019),.......10, 12, 18, 21

*Hill v. McDonough*,
547 U.S. 573 (2006).........................................................................10

*Lair v. Bullock*,
697 F.3d 1200 (9th Cir. 2012) ........................................................11

*Lopez v. Brewer*,
680 F.3d 1068 (9th Cir. 2012) ........................................................10

**TABLE OF AUTHORITIES**

**Page(s)**

*Mitchell v. United States*,
958 F.3d 775 (9th Cir. 2020) ....................................................................21

*Morse v. ServiceMaster Global Holdings, Inc.*,
2013 U.S. Dist. LEXIS 3663 (N.D. Cal. Jan. 8, 2013)......................................11

*Osorio-Martinez v. Attorney Gen. of the U.S.*,
893 F.3d 153 (3d Cir. 2018) ......................................................................20

*Sampson v. Murray*,
415 U.S. 61 (1974)....................................................................................19

*Towery v. Brewer*,
672 F.3d 650 (9th Cir. 2012) .....................................................................10

*Transfirst Grp., Inc. v. Magliarditi*,
2017 WL 2294288 (D. Nev. May 25, 2017) ...................................................21

*United States v. Rodriguez*,
553 U.S. 377 (2008)..................................................................................16

*United States v. Hammer*,
121 F. Supp. 2d 794 (M.D. Pa. 2000)..........................................................15

*Wainwright v. Booker*,
473 U.S. 935 (1985)..................................................................................18

*Zepeda v. I.N.S.*,
753 F.2d 719 (9th Cir. 1983) .....................................................................19

**Federal Statutes**

18 U.S.C.§ 3596 .........................................................................................12

28 C.F.R. § 26.3 ......................................................................................8, 12

2020 WL 3492763 (U.S. June 29, 2020) ........................................................10

## I. INTRODUCTION

Appellant Lezmond Mitchell moves for a stay of execution to prevent the Government from executing him in a manner that violates the Federal Death Penalty Act (FDPA) and the sentencing court's January 2004 judgment. This motion presents a controversial issue, never previously considered by this Court, concerning the meaning of the FDPA's requirement that executions be implemented in the manner prescribed by state law. The United States Supreme Court unanimously upheld a preliminary injunction to allow the Court of Appeals for the District of Columbia to consider this issue. This Court should likewise stay Mitchell's execution to thoroughly consider this novel question of grave importance.

## II. RELEVANT FACTS AND PROCEDURAL HISTORY

On May 20, 2003, an Arizona jury recommended that the District Court for the District of Arizona sentence Mitchell to death. On September 10, 2003, the Government submitted a proposed judgment and order which stated: "When the sentence is to be implemented, the Attorney General shall release the Defendant to the custody of the United States Marshal, who shall supervise the implementation of the sentence in the manner prescribed by law of the State of Arizona." District

Court Case No. 01-CR-1062, Dkt. No. 411 at 4:1-3.[1] On September 15, 2003, the district court formally sentenced Mitchell to death and issued its judgment, which included the following directive:

> Pursuant to the Federal Death Penalty Act of 1994, specifically, Section 3594 of Title 18 of the United States Code, pursuant to the jury's special findings returned on May 20, 2003, and pursuant to the jury's unanimous vote recommending that the defendant be sentenced to death, IT IS THE JUDGMENT OF THIS COURT THAT the defendant, Lezmond Charles Mitchell, be sentenced to death on Count Two of the Second Superseding Indictment. The judgment and death sentence on Count Two is supported by independent verdicts with regard to each victim. Furthermore, pursuant to Title 18, Section 3596 of the United States Code, the defendant is hereby committed to the custody of the Attorney General of the United States until exhaustion of the procedures for appeal of the judgment and conviction and for review of the sentence. When the sentence is to be implemented, the Attorney General shall release the defendant to the custody of the United States Marshal, who shall supervise implementation of the sentence *in the manner prescribed by the law of the State of Arizona.*

Dkt. No. 425 (emphasis added). This language mirrored language submitted by the Government in its Proposed Judgment and Order (Dkt. No. 411), and the Government did not object to this language at the formal sentencing hearing or in

[1] All docket references refer to the district court's docket in Mitchell's criminal case unless otherwise specified.

any later motion. The district court subsequently amended its judgment on January 8, 2004, but left the above portion of the order unchanged. Dkt. No. 466.

On July 25, 2019, T.J. Watson, the warden of the Federal Correctional Complex at Terre Haute, Indiana ("USP Terre Haute") served Mitchell with a letter indicating that pursuant to 28 C.F.R. § 26.3(a)(1), the Director of the Bureau of Prisons ("BOP") had set December 11, 2019 as Mitchell's execution date. The same day, in the four pending federal lethal injection lawsuits in the District Court for the District of Columbia, the Government filed a notice indicating that it had adopted a revised lethal injection protocol (2019 Protocol). Dkt No. 606-1. On July 31, 2019, Watson served an amended letter on Mitchell, correcting the name of the sentencing judge that was misstated on the prior version.

On October 4, 2019, this Court stayed Mitchell's execution pending its consideration of a previously filed appeal. *Mitchell v. United States*, Ninth Cir. Case No. 18-17031, Dkt. 26 (Oct. 4, 2019). The Ninth Circuit ultimately affirmed this Court's denial. *Id.*, Dkt. 37 (Apr. 3, 2020).

Before the Ninth Circuit's mandate issued, on July 29, 2020, Watson served Mitchell with a letter indicating that pursuant to 28 C.F.R. § 26.3(a)(1), the BOP had set an execution date for Mitchell of August 26, 2020. (Ex. B, July 29, 2020 Letter.) Mitchell moved to vacate the execution date as it failed to comply with the FDPA or with the trial court's judgment, and further moved to stay his execution

pending the resolution of the motion. After briefing but no evidentiary development, the district court heard oral argument on August 12, 2020 (Exhibit 1), and entered an order denying Mitchell's motions on August 13, 2020 (Exhibit 2). In that order, the district court interpreted the FDPA, and the court's judgment, as requiring that Mitchell be executed by the method used in Arizona – lethal injection. In addition, although the Government is required to follow state procedures prescribed by Arizona law, the court found that Arizona has no state statutes or regulations that have the force and effect of law aside from the mandate that executions be carried out via lethal injection, and therefore federal Government must simply execute Mitchell via lethal injection.

Mitchell entered a notice of appeal that same day, and now moves this Court to stay his execution pending the resolution of this appeal.

## III. ARGUMENT

### A. Relevant factors for a stay of execution

Courts consider four factors, balanced against each other, when considering a motion for a stay of execution: (1) the likelihood of the moving party's eventual success on the merits; (2) the threat of irreparable harm to the moving party unless a stay is issued; (3) the balance of hardships amongst the interested parties; and (4) the interests of the public. *See Beaty v. Brewer*, 649 F.3d 1071, 1072 (9th Cir. 2011) (citing *Winter v. Natural Res. Def. Counsel, Inc.*, 555 U.S. 7 (2008)).

This standard applies to "inmates seeking time to challenge the manner in which the State plans to execute them must satisfy all of the requirements for a stay, including a showing of a significant possibility of success on the merits." *Hill v. McDonough*, 547 U.S. 573, 584 (2006). "[A] stronger showing of one element may offset a weaker showing of another." *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012); *see also Towery v. Brewer*, 672 F.3d 650, 657 (9th Cir. 2012) (same).

The issues presented in this motion were the subject of detailed litigation in the District of Columbia. The district court for the District of Columbia issued a preliminary injunction barring multiple executions based, in significant part, on the claim that the Government's 2019 Protocol contravenes the FDPA and the plaintiff's individual death judgments. *Matter of Fed. Bureau of Prisons' Execution Protocol Cases*, No. 12-CV-0782, 2019 WL 6691814 (D.D.C. Nov. 20, 2019), *vacated and remanded sub nom. In re Fed. Bureau of Prisons' Execution Protocol Cases*, 955 F.3d 106 (D.C. Cir. 2020), *cert. denied sub nom. Bourgeois v. Barr*, No. (19A1050), 2020 WL 3492763 (U.S. June 29, 2020).[2] The Government sought to vacate the preliminary injunction, but a unanimous Supreme Court upheld the preliminary injunction. *Barr v. Roane*, 140 S. Ct. 353 (2019). The

[2] Mitchell is not a party to this lawsuit.

circuit court for the District of Columbia then conducted an appeal with full briefing and oral argument, and ultimately issued a *per curiam* decision in which the three members of the panel took entirely different views of the law. However, two of the three judges agreed that the FDPA requires more than simply following a state's top-line method of execution. *In re Fed. Bureau of Prisons' Execution Protocol Cases*, 955 F.3d 106 (D.C. Cir. 2020).

## B. All of the factors weigh heavily in favor of granting Mitchell's request for a stay of execution.

### 1. Mitchell presents a substantial case for relief on the merits of his claim that the BOP's noticed execution of Mitchell violates the FDPA and the terms of the district court's 2004 judgment.

It is Mitchell's burden to establish that his appeal presents a "substantial case for relief on the merits." *Lair v. Bullock*, 697 F.3d 1200, 1204 (9th Cir. 2012). While the Ninth Circuit has not yet clearly defined that phrase, "[o]ften a 'substantial case' is one that raises genuine matters of first impression within the Ninth Circuit." *Morse v. ServiceMaster Global Holdings, Inc.*, 2013 U.S. Dist. LEXIS 3663, at *3 (N.D. Cal. Jan. 8, 2013) (citing *Britton v. Co-Op Banking Group*, 916 F.2d 1405, 1412 (9th Cir. 1990)).

Mitchell's case was the first federal death penalty case to be tried within the Ninth Circuit under the FDPA and, if he is executed, his will be the first execution from this Circuit under the FDPA. The issues presented in this motion are all

matters of first impression within this Circuit, thereby meeting the "substantial case" standard.

Mitchell is likely to succeed in his claim that the BOP's noticed execution violates the FDPA and the district court's 2004 judgment. Both require that Mitchell's execution be implemented "in the manner prescribed by the law of the State of Arizona." Dkt. No. 425; 18 U.S.C. § 3596. Mitchell's warrant, in contrast, provides that his execution should be implemented pursuant to 28 CFR 26.3(a)(1), which sets forth a distinct federal manner of implementation detailed further in the BOP Addendum. Dkt. No. 606-1. On its face, then, Mitchell's warrant notices an execution that is not in the "manner prescribed by the law of the State of Arizona."

The parties dispute the meaning of the terms "implementation of the sentence in the manner prescribed by the law of the State." 18 U.S.C. § 3596. In proceedings before the District Court, the Government contended that this phrase merely requires that the Government execute Mitchell using Arizona's "top-line" choice of execution protocol: lethal injection. Dkt. 611 at 6-13. Mitchell, on the other hand, established below that this phrase requires that the Government follow Arizona's lethal injection protocols, which Arizona officials are legally bound to follow with respect to every execution that occurs within Arizona's borders. The court below adopted a middle-ground approach, similar to Judge Rao's view in *Protocol Cases*, 955 F.3d 129-145, requiring that the Government follow Arizona

state law, as codified in statutes and regulations that have the force and effect of law, but not less formal state protocols. Ex. 2 at 061.

The plain text of the statute favors Mitchell's reading. "Implementation" means more than a single act; rather, it entails the process of making something happen. Merriam-Webster.com Dictionary, Merriam-Webster, https://www.merriam-webster.com/dictionary/implementation. (defining "implementation" as "the process of making something active or effective"); *see also* Black's Law Dictionary (10th ed. 2014) (defining "Implementation Plan" as "An outline of steps needed to accomplish a particular goal").

"Prescribed" is another expansive term that includes direction at various levels of formality. Merriam-Webster's Collegiate Dictionary 921(10th ed. 1994) (defining "prescribe" as "to lay down as a guide, direction, or rule of action"); *see also* Oxford English Dictionary Online (defining "prescribe" as "[t]o write or lay down as a rule or direction to be followed; to impose authoritatively, to ordain, degree; to assign").

Likewise, "manner" is a broad term that encompasses the procedures surrounding a prisoner's execution. Merriam Webster's Collegiate Dictionary 708 (10th ed. 1993) (defining "manner" as "a mode of procedure or way of acting"); Webster's Collegiate Dictionary 609 (5th ed. 1936) ("way of acting; a mode of procedure"). The breadth of the term "manner" stands in contrast to "method,"

which has a specific meaning in the death-penalty context. Had Congress intended that deference to state law be limited to the state's chosen execution *method*, using this word would have clearly signaled such intent. *See Advocate Health Care Network v. Stapleton*, 137 S. Ct. 1652, 1659 (2017) (when Congress "did not adopt 'obvious alternative' language, 'the natural implication is that [it] did not intend' the alternative").

The Court of Appeals for the District of Columbia considered the meaning of the FDPA's use of "implementation of the sentence in the manner prescribed by the law of the State." *Protocol Cases*, 955 F.3d at 108. Although the three judges reached different interpretations of the FDPA, two of the three judges on the panel rejected the position that the FDPA's language requires adherence only to the *method* of execution provided by state law. *Id.* Judge Rao concluded that "the FDPA also requires the federal government to follow execution procedures set forth in state statutes and regulations, but not execution procedures set forth in less formal state execution protocols." *Id.* at 112. (Rao, J., conc.) Judge Tatel "agree[d] with Judge Rao that the term 'manner' refers to more than just general execution method, but went further to conclude that the FDPA "requires federal executions to be carried out using the same procedures that states use to execute their own prisoners – procedures set forth not just in statutes and regulations, but also in

protocols issued by state prison officials pursuant to state law." *Id.* at 146 (Tatel, J., dissenting).

Similarly, the district court in *United States v. Hammer* held that the FPDA required compliance with state procedures more broad than the selection of execution method. 121 F. Supp. 2d 794 (M.D. Pa. 2000). Hammer, who had been sentenced to death in district court in Pennsylvania, objected to an intended autopsy of his body after execution. The district court held that Pennsylvania law governed the question of whether Hammer's religious objections required the government to forego an autopsy. *Id.* at 800 ("The implementation of Mr. Hammer's sentence of death is required to be consistent with the procedures set forth in the Pennsylvania Statutes, and those procedures include a section addressing whether an autopsy should be conducted.").

Indeed, even the district court below had apparently originally understood the 2004 judgment to require compliance with Arizona's lethal injection protocol, as demonstrated when the court inquired how Mitchell's execution would be conducted in conformance with "Arizona procedures," whether he would be moved to Arizona or whether another process would ensure that it "conforms with Arizona procedures." Dkt. No. 606-6 at 083-84. The Court then commented that "Arizona procedures" had recently changed, suggesting that the Court's understanding of these procedures included what was set forth in the protocols

adopted in 2017, rather than the method of execution, which has been lethal injection since 1992. *See* Dkt. No. 606-3.[3]

As detailed further in Mitchell's limited briefing on the matter, a broader interpretation of "manner" is also consistent with the larger context of the FDPA, its legislative history, and the DOJ's own interpretation of the statute. Dkt. No. 606 at 7-9. The Court below concurred in this analysis. Dkt. No. 618 at 4-10.

But even if this Court concurs with the court below and Judge Rao, Mitchell can still establish a likelihood of success on the merits. The court below held that compliance with the FDPA requires that Mitchell's execution procedures follows those of state statutes and regulations that have the force and effect of law. The Supreme Court has stated that something is "prescribed by law" when it includes binding requirements. *United States v. Rodriguez*, 553 U.S. 377, 390-91 (2008). Mitchell established below that the Arizona state protocols are indeed binding on Arizona state officials and provide inmates with legally enforceable rights. Dkt. No. 606-3, 606-4. A detailed factual analysis of the Arizona protocols and their ability to bind Arizona officials would establish that these protocols have the effect of state law.

[3] Available at https://corrections.az.gov/public-resources/death-row/arizona-death-penalty-history.

If the Court does not find that Mitchell has established a likelihood of success on the merits, this finding is not fatal to Mitchell's entitlement to a stay. Mitchell may alternatively demonstrate that "serious questions going to the merits" of his claims are presented in his appeal, and obtain a stay as long as the other factors weigh in his favor. *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011). The meaning of the FDPA's requirement that executions be implemented in the manner prescribed by state law is an issue of first impression in the Ninth Circuit. The Supreme Court unanimously upheld a preliminary injunction on this issue such that the Court of Appeals for the District of Columbia could consider the matter with appropriate deliberation. *Barr v. Roane*, 140 S. Ct. 535 (2019). And when that court did consider the matter, the questions presented were a source of substantial debate among the judges on the panel. *Protocol Cases*, 955 F.3d at 108. The lower court's own concerns about this issue (dkt. no. 606-5) demonstrate that Mitchell's motion, at minimum, raises a substantial case questions about whether the BOP's noticed execution of Mitchell violates the FDPA. Because the balance of hardships tilts strongly in his favor, a stay of execution is appropriate. *All. for the Wild Rockies*, 632 F.3d at 1131-32.

**2. Mitchell faces the greatest possible irreparable harm.**

Absent a stay, Mitchell could be executed before he can pursue this litigation and thus could be executed by means of an illegal protocol. The harm could not be

greater or more irreparable. *See, e.g.*, *Wainwright v. Booker*, 473 U.S. 935, n.1 (1985) (Powell, J., concurring in decision to vacate stay of execution) ("The third requirement – that irreparable harm will result if a stay is not granted – is necessarily present in capital cases."); *Evans v. Bennett*, 440 U.S. 1301, 1306 (1979) (granting stay of execution in light of the "obviously irreversible nature of the death penalty").

The harm to Mitchell is not undermined by the fact that the Government would be able to execute him had it chosen to proceed in a manner permitted by the FDPA, i.e., the manner prescribed by Arizona law. The execution, as the Government currently intends to implement it, is nonetheless illegal. *See Protocol Cases*, 2019 WL 6691814, at * 10-11 (finding irreparable harm in identical circumstances). And even if it were relevant whether federal and state execution procedures differ, Mitchell has shown that they do. *See* Dkt. 606 at 9-13 (comparing the BOP procedures to the Arizona procedures and establishing that Arizona's procedures are significantly more robust and would allow Mitchell, *inter alia*, better access to counsel, better training personnel, and more transparency regarding the lethal drugs).

**3. The balance of equities favors a stay.**

In contrast, the Government will not be irreparably harmed if Mitchell's execution is stayed. While the Government in opposing stays of execution often

claims an interest in the enforcement of criminal judgments, here that interest depends on whether the Government's noticed execution even constitutes a valid enforcement of the judgment and sentence entered by this Court. The Government cannot suffer harm from an order that merely restrains an unlawful action. *Zepeda v. I.N.S.*, 753 F.2d 719, 727 (9th Cir. 1983) ("[T]he INS cannot reasonably assert that it is harmed in any legally cognizable sense by being enjoined from constitutional violations.").

Wasted preparation efforts are inadequate to demonstrate irreparable harm to the Government. *Sampson v. Murray*, 415 U.S. 61, 90 (1974) (quoting *Virginia Petroleum Jobbers Ass'n v. Fed. Power Comm'n*, 259 F.2d 921, 925 (D.C. Cir. 1958) ("The key word in this consideration is irreparable. Mere injuries, however substantial, in terms of money, time and energy necessarily expended ... are not enough.")). Moreover, the Government could mitigate any potential financial harm by promptly stopping any preparations for Mitchell's execution.

Nor does the Government have any persuasive argument that delaying Mitchell's execution for the period of this litigation undermines its interest in the timely enforcement of capital punishment. The Government has stated that "a scheduled federal execution date cannot readily be moved in light of BOP contractor availability and other complex logistical consideration." *Mitchell v. U.S.*, No. 18-17031 (9th Cir., July 29, 2020), dkt. 47. In support of this statement,

it cited an application filed in the Supreme Court, which states that if the execution in question were delayed, it could not be rescheduled for at least *one* month. *Id*. (citing *Barr v. Lee*, No. 20A8, 2020 WL 3964985 (July 14, 2020)). In contrast, prior to this year, the Government had not executed a federal prisoner since 2003, and the Government itself suspended executions from 2011 until 2019. The Government's years-long delay in generating any execution protocols dwarfs its expected delay in rescheduling and undermines any purported claim of urgency. *Osorio-Martinez v. Attorney Gen. of the U.S.*, 893 F.3d 153, 179 (3d Cir. 2018) ("the fact that the Government has not – until now – sought to" act "undermines any urgency" to do so now).

Whatever urgency may exist, it was manufactured by the Government when it chose to set an execution date with just 28 days' notice at a time when the Ninth Circuit's stay order was still in effect. And whatever delay this litigation may cause is ultimately due to the Government's failure to plan an execution that adheres to the requirements of the FDPA and the trial court's judgment, despite over a decade's notice of the terms of each. "That the government's asserted harm is largely self-inflicted 'severely undermines' its claim for equitable relief." *Al Otro Lado v. Wolf*, 952 F.3d 999, 1008 (9th Cir. 2020) (quoting *Hirschfeld v. Bd. of Elections in City of New York*, 984 F.2d 35, 39 (2d Cir. 1993)).

**4. The public interest favors a stay.**

"The decision to seek the death penalty in Mitchell's case was made against the express wishes of the Navajo Nation, [and] several members of the victims' family," who are members of the Navajo Nation. *Mitchell v. United States*, 958 F.3d 775, 793 (9th Cir. 2020) (Christen, J., conc.). Navajo "culture and religion teaches us to value life and instruct against the taking of human life for vengeance." *Id.* It certainly upholds no public interest to carry out Mitchell's execution before ensuring that it proceeds in a manner prescribed by law and the Court's judgment.

Moreover, the public interest "is not served by executing individuals before they have had the opportunity to avail themselves of legitimate procedures to challenge the legality of their executions." *Protocol Cases*, 2019 WL 6691814, at *7. And the public at large also has an interest in making sure that agencies follow the law and that judgments are legally enforced. *California v. Azar*, 911 F.3d 558, 581 (9th Cir. 2018); *Transfirst Grp., Inc. v. Magliarditi*, No. 17-CV-00487-APG(VCF), 2017 WL 2294288, at *1 (D. Nev. May 25, 2017).

Thus the public's interest weighs in favor of granting a stay.

**5. Mitchell has not delayed in bringing this motion.**

As the district court correctly found, Mitchell has not delayed in bringing this motion. Dkt. No. 618 at 3-4. The Government noticed Mitchell's execution on

July 29, 2020. Dkt. No. 605. Mitchell promptly filed a motion in this Court to vacate the execution date due to the still-pending stay of execution order this Court issued in *Mitchell III*, Ninth Circuit Case No. 18-17031, Dkt. No. 48, and then promptly filed a motions to vacate the execution date and stay the execution in the district court on August 6 and August 7, respectively. Dkt. No. 606, 609.

Mitchell did not wait until the eve of execution to file his motion; the proximity of his motion and execution date are not caused by any delay on Mitchell's part, but rather by the Government's decision to give Mitchell only 28 days' notice of his execution date.

## IV. CONCLUSION

For the foregoing reasons, the Court should grant a stay of execution in favor of Mitchell, so as to enjoin the Government from carrying out Mitchell's execution on August 26, 2020 or any other time until further order of this Court.

Respectfully submitted,

CUAUHTEMOC ORTEGA
Interim Federal Public Defender

DATED: August 14, 2020

By */s/ Jonathan C. Aminoff*
JONATHAN C. AMINOFF
CELESTE BACCHI
Deputy Federal Public Defenders

Attorney for Petitioner-Appellant
LEZMOND CHARLES MITCHELL

# EXHIBIT 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | | |
|---|---|---|
| United States of America, | ) | |
| Plaintiff, | ) | CR-01-1062-PCT-DGC |
| vs. | ) | Phoenix, Arizona<br>August 12, 2020<br>2:30 p.m. |
| Lezmond Charles Mitchell, | ) | |
| Defendant. | ) | |

BEFORE: THE HONORABLE DAVID G. CAMPBELL, JUDGE

**REPORTER'S TRANSCRIPT OF PROCEEDINGS**

**MOTION HEARING**

APPEARANCES:

For the Government:

U.S. Attorney's Office
By: WILLIAM G. VOIT, ESQ.
SHARON K. SEXTON, ESQ.
40 North Central Avenue, Suite 1800
Phoenix, AZ 85004

For the Defendant Mitchell:

Federal Public Defender's Office
By: JONATHAN C. AMINOFF, ESQ.
CELESTE BACCHI, ESQ.
321 East 2nd Street
Los Angeles, CA 90012

Official Court Reporter:
Linda Schroeder, RDR, CRR
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc. 32
Phoenix, Arizona 85003-2151
(602) 322-7249

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

(Hon. David G. Campbell, Mr. Aminoff, and Ms. Bacchi appeared via video teleconference.)

THE CLERK: This is case number CR 01-1062, United States of America versus Lezmond Mitchell, on for motion hearing.

MR. VOIT: Good afternoon, Your Honor. William Voit and Sharon Sexton for the United States.

THE COURT: Good afternoon.

MR. AMINOFF: Good afternoon, Your Honor. Deputy Federal Public Defenders Jonathan Aminoff and Celeste Bacchi for Lezmond Mitchell.

THE COURT: All right. Good afternoon. Go ahead and have a seat please.

All right. We are here for the hearing, the oral argument on the -- both motions that have been filed by Mr. Mitchell. I've read all of the briefing that you have provided. I've read the attachments that you have provided. I've read the D.C. Circuit case two or three times, so I'm pretty familiar with what the three judges in that case have said since they sort of cover the waterfront on the issues that we're dealing with.

I have some questions, but I think I'll largely hold them until the end of your arguments unless there's something you say that prompts a question that I think I should ask right then.

Since these are the defendant's motions, I think we should have defense counsel go first. How much time do you all think you need for your argument?

MR. AMINOFF: We'll keep our points pretty brief, Your Honor. And I think it sounds like the Court's very familiar with these issues. So there's a few points we'd like to highlight, and then I would be very interested in hearing Your Honor's questions.

THE COURT: Okay. All right. Why don't we go ahead and start with your argument then.

MR. AMINOFF: Thank you, Your Honor. Just to make a few points on timeliness, when we got the second notice of execution date, we actually were not expecting it when we got it. We still had an active stay of execution from the Ninth Circuit, and we were only given 28 days' notice before the execution was going to occur.

We promptly filed our motion with this Court once the issue became ripe again.

So I don't think there's any question as to whether our motion is timely, considering that we had a stay of execution last time that effectively got rid of the December execution date.

I'm going to just move right along and get into sort of the substance of what we're really talking about today, and that's sort of what the court's order meant when the court said

that Mr. Mitchell should be executed in the manner prescribed by the State of Arizona.

So far every court that has really dealt with this issue has agreed that implementation in the manner prescribed by state law does not mean just the top-line method of execution. It encompasses much more than that.

That's also consistent with the Supreme Court's use of the term manner in the execution context in the *Glossip*, *Baze*, and *Holden versus Minnesota* case of 1890.

In addition, in the *Kemmler* case from 1890, the Supreme Court again is very clear that manner is a broad term when used in this context and does not just mean the top-line choice of execution method.

The same goes with implementation. And it's, you know, the government has its own regulations for how an execution proceeds, and those are codified at -- it's 28 CFR 26.3 and 26.4.

And those sections are titled "Implementation of Federal Death Sentences." And those sections include much more than top-line method of execution. They include much more minor details such as notice requirements, place of execution, time of execution, points that go vastly beyond top-line method of execution.

I think it's worth noting that since the FDPA was passed in '94, the Department of Justice on nine separate

occasions has sought authorization from Congress to create their own singly applicable lethal injection protocol. Congress has never done that.

And it is telling that the Department of Justice thought that they had to and up until this point has kind of freely admitted that they don't have the authority to do this.

The fact that they have tried and failed, the Supreme Court has acknowledged not in this particular context but has acknowledged that when an amendment to a statute is attempted and does not pass, it wouldn't really make a lot of sense to interpret the statute in that way.

And I'm referring to *Fourth Estate versus Wall-Street.com*. And I think it's worth noting that even in the government's briefs that they filed in the *Baze versus Rees* case, they specifically distinguish between method and implementation, acknowledging that implementation is a broad term.

So I think we are on fairly solid ground when it comes to our interpretation of this statute, which I think was consistent with what the Court mentioned, when we were back in front of the Court in August, that what the sentencing order in this case requires is that Lezmond Mitchell is executed in accordance with how that execution would be carried out in Arizona.

THE COURT: Mr. Aminoff --

MR. AMINOFF: Yes, sir.

THE COURT: -- do you agree with the government's assertion that there has been no attempt to amend the FDPA since all of the states settled on one form of execution, namely, lethal injection?

MR. AMINOFF: I would have to double check on the last time that something went to Congress on this, but I can say, Your Honor, that even at this precise moment, California technically is not just a lethal injection state. It offers inmates the choice of lethal injection or lethal gas.

So I don't think it's true that the states are unanimously lethal injection states.

THE COURT: Well, the reason I asked that was this thought: I understand what you've said about the nine attempts to amend the FDPA. But it seems to me that that effort could have been undertaken in order to obtain a single top-line method of execution when the states had varying methods rather than to come up with a single set of procedures that differ from the state procedures.

In other words, the fact that the amendments were sought is not necessarily inconsistent with the government's argument that what the FDPA refers to is the single top-line method.

Would you give me your thoughts on that.

MR. AMINOFF: Well, Your Honor, I think a couple of

things.

I mean, to start with, I think even if, even if that was the government's interpretation, I think that's inconsistent with Congress's interpretation, because when Congress passed the FDPA, the federal government already had a lethal injection protocol they created the year before. And rather than Congress writing the FDPA to give the government the power to use that, they specifically deferred to the states.

And so I, again, I would need to double check the last time that DOJ tried to get the amendment passed. But I sort of think, regardless, that was clearly not Congress's intent.

And, I mean, to read the FDPA in that way just -- I don't understand what the logic of it would be, because if the government's interpretation was correct, what the FDPA would require is if you're sentenced to death in a state that has the death penalty, they're allowed to execute you in Indiana under a federal protocol, provided they use the top-line method.

However, if you're sentenced to death in a state that does not have the death penalty, then the federal court picks a different state, and then you must be executed in that state in accordance with that state's law?

The paradox just makes absolutely no sense to me. I don't see why that would be Congress's intent.

I think the other important thing worth noting, Your

Honor, is there wasn't a federal death row, so-to-speak, when the FDPA was passed. Like, the chamber at Terre Haute was not built until 1995, and this law was passed in '94. So I think it made complete sense for Congress to leave this to the states. And, I mean, that was the practice from 1937 onwards, that -- 1937 until 1984, when the vast majority of executions took place in state court.

I mean, the first person executed under -- Sorry. I'm referring to Mr. Garza. I think he was the first person executed once executions resumed. He was housed in Texas death row until shortly before his execution, when he was transferred to Terre Haute to be killed.

So I don't think that the intention was ever really that these executions were going to happen as they're now being contemplated.

And absent a change in the law, I don't see where the government gets this authority.

I would like to just touch on a few points on why this is significant in this case, if that's all right.

Were Mr. Mitchell executed in accordance with Arizona law, he would be entitled to much more protection because Arizona has a much more time tested and judicially reviewed protocol than what the federal government has.

And I think there are certain points worth highlighting, one of which is simply how the injection process

would work, like where the lines would be inserted and who would be doing the inserting.

And this is really a continuing problem in lethal injection cases. Where the problems occur is where a line is not inserted properly.

And the Arizona protocol ensures that licensed, trained professionals are doing it, whereas the Bureau of Prisons' protocol is very vague on that point. We don't really know what the requirements are of those people.

And that really could subject Mr. Mitchell to Eighth Amendment concerns.

There's also a notice period. And, you know, there's a formal process in Arizona that's governed by Arizona state law that requires that before an execution date be set, the government goes to the courts and seeks an execution warrant. And there's an opportunity at that point in time for the defense to make arguments why it would be impractical to get a warrant at that time and allows for a 60-day extension. And had that happened in this case, we wouldn't have wasted so much of the Court's time last year when there was a stay of execution in place and the government sought an execution.

The same thing goes here. We -- Our opportunity to petition for clemency has been extremely impeded upon by the government because we weren't able to petition for clemency until they set this new date. And now -- In the ordinary

course, the clemency office should have 30 days to even just receive your petition. Now, if we waited 30 days, Mr. Mitchell would have been dead for two.

So this roughshod process that they're throwing together now, this is exactly why laws like those in Arizona exist and why the government should be made to follow them.

That's it for the time being, Your Honor. Thank you.

THE COURT: Well, let me ask you a couple of questions about other --

MR. AMINOFF: Yes, please.

THE COURT: -- issues, Mr. Aminoff.

If I agree with your reading of the word manner in the FDPA, then I still have to decide what state law, what Arizona law to look to or what Arizona law the FDPA requires to be applied. I assume you agree that whatever I look to has to be law in Arizona. Is that right?

MR. AMINOFF: I actually find myself more in agreement with Judge Tatel's opinion, Your Honor, but were that your view, I think there are very solid reasons to believe that Arizona's protocol is law. And I think the fact of the matter is this stipulation that we entered into evidence as Exhibit D has been adopted, and that stipulation creates legally enforceable rights by death row inmates.

So for all intents and purposes, the Arizona protocol is now -- is now state law. And so I think even if you follow

Judge Rao's interpretation, I think we are still covered here, and this execution needs to proceed as if it was taking place in Arizona.

THE COURT: Well, let me ask you a question on that point. I've read the stipulation. It looks to me like a contract. It's a settlement agreement between the litigants. It sets out seven specific covenants like a contract would that the state is going to abide by. It names Arizona death row inmates as third-party beneficiaries, which is clearly a contract notion. You can enforce the agreement.

When it talks about the actions that can be brought, it talks about breach of the agreement, the state's breach, and that the Court can reopen the case and enjoin the breach.

Everything about it looks like a contract entered into to settle the case with designated third-party beneficiaries and a method of enforcement.

So I guess my question to you is if that's right, if it's an enforceable contract, how does that make it law, law of Arizona?

MR. AMINOFF: Because I think it creates an individually enforceable right for everyone sentenced to death in the State of Arizona. I think what it does is it allows anyone now who is sentenced to death to enforce the specifics of the protocol.

And whereas in the past the protocol specifically said

it did not create a legally enforceable right, now the Attorney General of Arizona has entered into this contract, if we want to call it a contract, with every death sentenced inmate in Arizona to give them the protection of this protocol.

Now, if anyone was sentenced to death in Arizona, this would have to be followed. This is more than just an informal procedure, which is what I think Judge Rao was talking about. This is a legally enforceable document.

And so in the same way that anyone in Arizona would be entitled to these protections, Mr. Mitchell has to be as well.

THE COURT: Well, let me ask a couple of questions to break that down to make sure I understand your position.

If you and I enter into a contract in Arizona even in settlement of a lawsuit and I have the legally enforceable right to hold you to your promise in that contract, would you say that the contract is law of Arizona or that my right to enforce the contract is Arizona law, the law of the state?

MR. AMINOFF: I see your point, Your Honor, and I think if you and I as two private citizens entered into a contract, I'd be hard pressed to say that the provisions of that then became law.

But I think in this particular context, given that it's the state that's entering into this with the class of all death row inmates, it takes on a different meaning. And I think what Judge Rao was talking about was formality. And this

is now a formal, set protocol that applies to all of the inmates in Arizona.

And, you know, Judge Rao noted in her opinion that when we talk about something that's binding law, she wrote that the Supreme Court has emphasized that something is, quote, prescribed by law when it includes binding requirements. This document creates a binding requirement on the State of Arizona to every death row inmate.

THE COURT: Well, let me just push you a bit more on that to make sure I hear all of your thoughts.

I agree with you that the settlement agreement is binding on the state. I agree with you that all of the death row inmates in Arizona are designated third-party beneficiaries and have the right to enforce the settlement agreement in court.

The difficulty I'm having is that -- is the language of the FDPA. It doesn't say that the Marshal shall implement the sentence in accordance with binding requirements in Arizona. It says in accordance with the law of Arizona.

That seems to me to be a very specific term. And so I'm having trouble with the notion that Congress, when it said the law of the state, meant the contractual rights within the state, because it didn't say that.

That's the biggest issue I've got with that argument you're making. And you may have covered it fully. But I want

to hear everything else you wish to say on that point.

MR. AMINOFF: Well, I understand Your Honor's point, and I just -- I do respectfully disagree, as I think you can tell.

I mean, when I read that, to me it says the manner prescribed by the law of the State of Arizona, which would be all of the legally enforceable rights that death row inmates have in Arizona.

But even if Your Honor does not agree with me on that point, there are other things that would still apply even if Your Honor does not accept that the protocol itself would.

And I think those things are codified in Arizona law and their Arizona Rules of Criminal Procedure such as the notice requirements, which have not been followed here.

So the things that are outside of the protocol would certainly be considered Arizona law.

THE COURT: Before we go there for a minute, Mr. Aminoff --

MR. AMINOFF: Yes, sir.

THE COURT: -- and I do want to hear your thoughts on that point, but I'll forget the question I have on something you said if you go very far.

MR. AMINOFF: Yes, sir.

THE COURT: You said a moment ago that you agree with Judge Tatel's interpretation of prescribed by law in the FDPA.

Let me ask you this question.

Judge Tatel's reasoning was that the protocols at issue in the D.C. Circuit case were issued by state authorities authorized by law to issue them. They were issued by these authorities in order to carry out the statutory requirements of their state, and therefore the protocols were prescribed by law, something to that effect.

I'm wrestling a bit with the word prescribed. It's a fairly specific word. To me prescribed means to fix or to set down, to establish.

So when you're talking about the manner of death prescribed by law, it seems to me the law must prescribe the manner of death. The law must not simply authorize somebody else to do so, which is what Judge Tatel seemed to be concluding.

I don't know if that distinction in my mind makes sense, but if it does, could you give me your thoughts on it.

MR. AMINOFF: I hope I'm following you, Your Honor.

THE COURT: Well, let me give you a specific example.

MR. AMINOFF: Okay. Yes, please.

THE COURT: The law of Arizona or the law of one state, State A, says the death penalty should be carried out in the following five steps. The law of State B says the director of the Department of Corrections shall set forth the procedures for the death penalty.

Judge Tatel, I think, would say that the procedures set forth by the director in State B are prescribed by law because the law tells the director to set them forth.

That's what I'm wrestling with, because it seems to me the law of State B does not prescribe the procedures. It doesn't prescribe the manner of death. What it does is tells somebody else to do that. So you can't look to the director's protocols and say those are prescribed by law. They're not. They're the procedures that somebody authorized by law to do, whereas in State A the law actually prescribes the procedures. It sets them forth in detail.

And I think Judge Tatel would say the FDPA applies to both states. But I guess my view is a strict reading of prescribed would mean it would only apply in State A to the steps that were actually prescribed by law.

I would appreciate your thoughts on that idea.

MR. AMINOFF: I see your point now, Your Honor. Thank you for breaking that down a bit more.

I think I would agree with Judge Tatel, and the reason that his logic makes sense to me is because of the second portion of 3596 that talks about if the Court were to designate another state, then the sentence shall be implemented in the latter state in the manner prescribed by such law.

So if that were the situation -- I mean, say, for example, this case had actually occurred somewhere else and

Your Honor had designated Arizona as the state for Mr. Mitchell's execution -- then undoubtedly, right, he would have been executed in Arizona in accordance with all of Arizona's let's call them rules, so what's in the code of -- the Rules of Criminal Procedure, the set law, protocols, everything, exactly the way they would have done it with the one exception of it wouldn't have necessarily had to have occurred in the state facility. It could have happened in a federal facility. But otherwise it would have followed entirely Arizona's rules.

So if that's -- if that's how you read the second portion of 3596, then I don't see why it would make any sense that the first portion would differentiate between the firmly established strict interpretation of a law versus a protocol.

That just doesn't -- I don't understand that distinction.

THE COURT: Well, let me make sure I understand that point. In the second sentence --

MR. AMINOFF: Yes.

THE COURT: -- it says three things:

One, the court shall designate the other state;

Two, the sentence shall be implemented in that state --

MR. AMINOFF: Yes.

THE COURT: -- presumably meaning has to be within the

geographical boundaries of the state; and

Three, in the manner prescribed by such law, which is very similar to in the manner prescribed by the law in the first sentence.

So why wouldn't my hypothetical distinction apply in the second sentence as well as the first, provided that the execution occurred within the state as required by the second sentence?

MR. AMINOFF: I have never seen that portion of 3596 interpreted in that way. And maybe I'll look into it a bit further. But every time I have seen someone sent to a state and just of the cases that I have read -- Because this happened routinely from 1937 until 1984 that people were sent to or housed -- They were usually left in whatever the state was and then executed in accordance with the state law but as if they were a state inmate.

I have not seen a person executed in the state where they were sentenced in accordance with a different protocol. And I -- I assumed that was the universal understanding, but I'm happy to look into that a bit further and provide the Court with more briefing on that if that would be helpful.

THE COURT: Okay. I'll let you know if I think that would be helpful.

MR. AMINOFF: Thank you, Your Honor.

THE COURT: I understand your point. I want to think

about it a bit. If I think we need additional briefing on any points, I'll get an order out today on it so we can do it quickly. I'm not sure we need additional briefing, especially given the compressed time we're working under.

MR. AMINOFF: Yes, Your Honor. Thank you.

THE COURT: But I interrupted you, Mr. Aminoff, if you were going on to make another point. I don't know if you remember what it is.

MR. AMINOFF: I don't. I don't remember. I'm sorry. If I think of it, I'll let you know, but I appreciate you guiding me where you're interested, Your Honor.

THE COURT: Well, let me hold on for a minute because I had a question about where you were going, so I'd like to remember it if I can.

MR. AMINOFF: Okay.

THE COURT: Oh, I do remember it. I think where you were -- what you were saying was that even if we don't look to the Arizona execution protocol for procedures and look just to the state statute, there are procedural requirements within the statute that are inconsistent with the federal protocol.

MR. AMINOFF: Yes, Your Honor.

THE COURT: And the question I had on that is this -- and I remember that argument from your brief -- even Judge Tatel in his decision said that the FDPA looks to procedures used to effectuate death. They don't look to every procedure

required. And as you know, the Seventh Circuit, the three-judge panel there, reached the same conclusion.

The three inconsistencies in Arizona statute with -- well, I think two are statute, and one is a rule -- inconsistencies with the federal protocol are not related to the method of inflicting death.

So even under Judge Tatel's view, it seems to me they wouldn't have to be followed under the FDPA. Could you address that please.

MR. AMINOFF: Yes, Your Honor. I'm sorry. Okay. I see what you're -- I'm sorry. It took me a second. I see what you're saying.

I mean, in our view -- and maybe I'm reading the statute a bit more broadly than Judge Tatel -- but the purpose is to follow exactly what would happen in the state court.

If we're going to limit that strictly to -- strictly to implementation of death, there are still issues that are relate -- So, for example, one thing that's triggered with the Arizona notice periods is an opportunity to receive notice of the drugs that are going to be used.

Now, certainly the drugs that are going to be used are relevant to the implementation of death. Within ten days of getting your notice you're allowed to seek information about whether the drugs are going to be compounded and quality tests on the drugs and so forth, which would potentially open the

door to additional litigation. That provision doesn't apply under the -- The BOP does not have an equivalent to that.

So I would think that even under Judge Tatel's limitation, anything related to the actual drugs that are going to be injected would also apply. And that's Arizona state law.

THE COURT: Okay. Well, let me ask sort of a summary question then on this subject. Is it your position that the FDPA requires the federal government to look to every single detail of state law regardless of whether or not it relates to the actual procedure for causing death?

MR. AMINOFF: I think, Your Honor, that this execution needs to go forward in the exact same way that it would in Arizona. I think the one exception to that is the location. I think if Your Honor doesn't agree with me on that, I think Judge Tatel's limitation is reasonable.

But the way I read this and I think the intent behind it is to keep discretion with the states, to defer to the states, and to not create a federal lethal injection protocol. That's my view, Your Honor.

So I do think that Judge Tatel's limitation is a reasonable fallback, but I believe in this case that this execution needs to go forward in the way that it would in Arizona.

THE COURT: Okay. The last question that I want to ask you before we turn to Mr. Voit: My intention is to get a

decision out at the latest by Friday but perhaps tomorrow.

MR. AMINOFF: Yes, Your Honor.

THE COURT: If I do that, which I think I will, it seems to me I should deny your stay request as moot, because the way you phrased your stay request was to stay the execution until I resolve the motion. And I will have resolved the motion tomorrow or Friday. Therefore, there won't be a need for an additional stay.

Do you disagree with that? Am I missing something in your stay motion?

MR. AMINOFF: I don't think you're missing something. I think perhaps that was slightly not well worded on my part. I think what might make sense is to stay this and allow review from the Ninth Circuit. And I'm not proposing that this goes on forever. We will very promptly file a notice of appeal if this does not go our way, but I think it would make sense to issue a brief stay to allow for review from the Ninth Circuit. And, you know, following what happened in D.C., I think that would make sense. I think the D.C. Circuit and the Supreme Court ultimately upheld the preliminary injunction that the district court in D.C. issued for the purpose of having this litigated fully.

The Ninth Circuit has never weighed in on this particular issue. This will actually be the first federal execution out of the Ninth Circuit. So I think it would be

appropriate to let this play out with, you know, obviously Your Honor's deliberation and then the Ninth Circuit's as well if they want to take a look at it.

THE COURT: Okay. All right. I may have some other questions for you after Mr. Voit, and I'll give you a chance to reply as well after he speaks.

MR. AMINOFF: Thank you.

THE COURT: Mr. Voit, let's go ahead and hear from you. If you want to come to the lectern, that's fine. If you're more comfortable sitting at counsel table, you can do that too.

MR. VOIT: I shall try from the lectern, Your Honor, and I have received permission from court staff to remove my mask for this argument. We are more than six feet away.

The defendant's motion to enjoin his execution should be denied for three different reasons: His delay, his lack of success on the merits, and the equities.

And to briefly summarize those, he has sat on this argument for a full calendar year. He raises an argument that just last month the Supreme Court chose not to stay executions in order to review. And he does so to quibble over things that are largely connected to the act of effectuating his death and none of which involve any actual showing of real likely harm to him in the course of his execution.

And for any of those reasons and certainly for all of

them, his motions should be denied.

I will also address the delay issue briefly, Your Honor, but I do think it is important the Supreme Court has said in the *Hill* case and the *Nelson* case that courts are required to apply a strong equitable presumption against staying or stopping executions when a claim, quote, could have been brought at such a time as to allow consideration of the merits without requiring entry of a stay.

And during the defense's argument, he referred to ripeness and said when the claim became ripe again, and I think that concedes this claim was definitely ripe in July of 2019, certainly in August of 2019 when we had the status conference.

The Supreme Court has specifically said piecemeal litigation, serial stays, is not a legitimate litigation strategy. And there is nothing that is different today than was -- than was the case in July of 2019.

The judgment is the same. The federal protocol is the same. The state protocol is the same. An execution has been noticed.

The only difference is the defendant has been able to watch and see what happens in the D.C. Circuit in the case that he represented he was going to reintervene in to make this very argument.

Had he prevailed and had that argument prevailed in the D.C. Circuit, it is hard to imagine he would not have

intervened at that point. Instead, he watched it fail and then came back to this Court in order to pursue it here.

The defendant's argument was definitely ripe, and it should have been brought a year ago so that this is not happening in a serial posture.

And the last thing I would say on that, Your Honor, is that if the defendant were ripe and he were allowed to do this -- he was allowed to litigate one issue, seek a stay, lose, have a new execution date noticed, and then do a second stay on the second issue -- it would guarantee that last-minute stay requests are the norm. In many contexts, although the federal government gives much more notice than what's required, in many contexts executions are noticed in a matter of days in the future. And so if this was a legitimate strategy, we would end up having these emergency motions all the time. And it simply isn't.

A claim could have been brought at a time to allow consideration of the merits without requesting a stay. And so the delay is a reason that the Court should deny it.

Turning to the merits --

THE COURT: Let me ask you a question on that, Mr. Voit. If I can, let me ask you a question on that.

I read the transcript of the status conference we had last August, just a little over a year ago, and during the question or -- pardon me -- during the status conference, I

asked you this question: I said, "Is the idea, from the government's perspective, the execution would occur there, meaning Indiana, but they would follow Arizona state procedures?" And your response was: "I'm not prepared to respond to that, Your Honor."

Now, you offered to brief it if we needed to, and I said, well, I don't know if we need to. But I guess my thought is that suggests that as of August, we didn't know -- I assume the defense didn't know; I didn't know -- whether or not Arizona procedures would be followed.

And so I get -- And then of course, as you know, by October there's a stay imposed by the Ninth Circuit, which sort of eliminates the December execution date.

So the question I have is when do you think the defendant clearly knew that it was the intent of the federal government not to follow Arizona state procedures?

MR. VOIT: July 25th, 2019, when the United States publicly noticed the federal protocol, which provides that federal procedures will be followed. That was publicly filed on the docket. Mr. Mitchell's lawyers are counsel of record in that case for another inmate. It was in fact the thing that subsequently was discussed in this court at that status conference as saying that that was the issue that they were -- that they had a litigation strategy about.

And so I think Mr. Mitchell, as the whole world knew

at that time, federal protocol providing for the specific drug that would be used, for the -- the things that the defendant now complains about, what he attaches to his motion, is the federal protocol that was filed on July 25th of 2019.

THE COURT: When you say filed, are you referring to filed in the D.C. case?

MR. VOIT: Yes.

THE COURT: Was there anything in the notice of death that was sent to Mr. Mitchell in 2019 or anything filed in this case that said the federal government was going to apply the federal protocol that had been filed in D.C.?

MR. VOIT: There was not filed in this case, Your Honor, no. The letter he was provided did reference federal regulations and said it would be carried out pursuant to federal regulations, but, no, the protocol itself was not specifically filed in this particular case.

I do think, however, Your Honor, there is no legal obligation for us to do that. And I think that everyone knew at the time of that status conference that the federal government would be carrying out those -- would be following the procedures it promulgated publicly when it announced these executions.

There's certainly nothing different between today and back then in terms of the government's provision of notice in that regard, yet the defendant certainly knows today that those

protocols are going to be followed.

THE COURT: Well, that's probably due in part to the fact that there was that (indiscernible) in the D.C. Circuit that made that crystal clear. But I don't have in front of me, Mr. Voit, the 2019 letter. I've got the July 2020 letter, and it says that "The purposes of this letter is to inform you that a date has been set pursuant to the judgment issued by Judge Murguia. This letter will serve as official notification that pursuant to Title 28 CFR Section 26.3(a)(1), the director of the BOP has set August 26 as the date for your execution."

That's the only reference in the letter to the CFRs. Do you believe that reference makes clear to Mr. Mitchell that the federal protocol would be applied? I haven't looked up this specific CFR cite.

MR. VOIT: Your Honor, I don't want to suggest to the Court that he was given specific notice in a written document that the government would be using the protocol other than the fact that the protocol was publicly announced to the entire country, publicly filed in the case in which he was previously a litigant and which his lawyers represent other litigants. And I don't think anybody will be able to represent to the Court that they were unaware in July and August of 2019 that the federal government would be using the protocol that it promulgated and publicly announced and intended -- it intended to use and in fact has vigorously litigated its intent to use

in that case publicly for the better part of a year. I --

THE COURT: Okay. I understand your position.

MR. VOIT: Turning to the issue of the merits, Your Honor, I think, when I analyzed it, I think that it might be easiest to start where everybody seems to agree. I think everyone seems to agree that when a statutory term is transplanted, original meaning follows unless there's a reason to think that the original meaning has changed. And everyone agrees that these are successor death penalty statutes.

I think everyone would agree you could use the word manner in different ways. And so the question is what is this particular statute about? How is it using it?

And I think everyone also agrees that in 1790 and for the ensuing 147 years, manner did mean method because it defined what manner meant, and it said hanging.

And so the question really is what is the evidence that the defendant has that Congress intended a change in the meaning of manner that had persisted for 147 years under that Act?

And it has to be clear evidence because courts do not infer substantial statutory changes in the absence of clear evidence.

We cited cases like *Ryder* and *Schmidt* and other cases for that proposition. And the change the defendant is suggesting is a very, very substantial one. As he put it in

his argument today, he says that we must do an execution in the exact same way, including the color of the labels that is provided in the Arizona protocol. To suggest that the federal government had assumed the burden of administering dozens and dozens of granular protocols like that is a big change. And to say that the federal government surrendered its inherent authority that it had used for 147 years to pick those procedures, that's a big change.

And also his argument necessarily suggests that the federal government has also abdicated responsibility for its own executions.

What if something goes wrong with one of these executions? Do we just get to say blame the state protocol?

That is a big change. And so there has to be strong, clear evidence that when Congress made the change, it meant to do what he says.

The better textual reasoning and certainly the legislative history and the practical history show that what Congress was doing was substituting one manner for another in 1937, not changing the meaning of manner itself.

The legislative history of that statute is very clear. The only thing it talked about was the method of execution. There's no reference to protocols or procedures at all in that document.

And indeed in the 1937 legislative history, the

particular concern was at the gen -- the level of the general method. It was described that there were now more humane methods used, and those were described as lethal gas and electrocution.

So there's certainly nothing in the 1937 Act that would support the defendant's argument of this very clear substantial change that he has to show in order to say that the meaning of manner has itself changed from the 1790 Act.

With respect to the provision about the latter state about why you don't do executions in the state itself, there's a very common sense explanation for that, Your Honor. If a state doesn't have the death penalty, it's not good enough just to say, you know, don't follow that state's law. You also don't want to carry out a capital sentence in that particular state. So that's why that latter state provision is in there. It's not intending to change the meaning of manner at all.

Certainly the 1994 Act doesn't provide any indication of an intent to change it. Again, it adopted the exact same language as before. The only change was that it substituted implementation for inflicting. If -- That is very thin ice upon which to suggest that there was at that point an intent to change 200 years of settled statutory understanding of what the manner of execution was.

And the historical practice shows -- and I would cite the Court the 1942 BOP Manual -- this is not some informal

document. This is not a newly developed litigating position. This is something that for 78 years, 78 years ago, that manual was promulgated and specifically said the agency tasked with administering the statute, that what manner means is method, and we get to pick protocols.

In the reply brief, the defense says, well, maybe you could have also followed state protocols. In that manual, Exhibit F, we attached the whole section. There are specific federal details about number of witnesses, types of witnesses, when you pick times and dates and when you don't. And it says that the Marshal is in charge of this.

There is -- That is inconsistent with the notion that the federal government under the 1937 Act had abdicated its authority that it had exercised at that point for a century and a half to control the details of state executions.

I would respond also to the citation --

THE COURT: Mr. Voit, let me ask you a question on that clear evidence point.

Judge Rao in her decision in the D.C. Circuit on Page 137 of the opinion says this: The government concedes that nearly all executions conducted under the 1937 statute took place in state facilities. Presumably those executions were carried out in accordance with state law and possibly with other state procedures. DOJ notes that three executions under the 1937 statute took place in federal facilities. The DOJ is

unable to identify a single way in which the executions were otherwise inconsistent with state law.

So she takes the view that it was done in states according to state procedures under the '37 Act. That's one piece I want to ask you about.

The second piece is in 1994 when Congress is about to pass the FDPA, DOJ has established a single uniform procedure. And the Attorney General, who, to me, is as good authority as the BOP Manual, said to them if you go forward with the statute you're planning, we will go back to the method of the 1937 statute that called or that -- under which the practice was to execute people in state facilities. And Congress went ahead and passed it.

Why is that not clear evidence that Congress consciously chose in 1994 to go back to a process that for 40 years had had people executed in state facilities under state procedures?

MR. VOIT: So a few responses to those questions, Your Honor. The Attorney General's letter -- and I will also offer to file a supplemental brief if the Court would find it helpful -- was concerned about the fact that at that time there were states that did not use lethal injection, and we had committed ourselves to using lethal injection. And that was the concern that was animating it, not about underlying protocols.

But I would also say that the question of what the government's view of this has been is something -- in 1937 -- is something that is settled in the 1942 protocol and in the newspaper articles we cited about how it was carried out. I would note those were not available to the D.C. Circuit at the time. They're not addressed in the opinion, and the government didn't provide them at the time.

But they, I think, show quite conclusively that the presumption in that statement isn't a correct one, because the federal government did have protocols and procedures promulgated in the 1942 BOP Manual.

I would also point to Exhibit D, which is the Associated Press article. That not only helps show that the common understanding of manner was method for the 1937 Act, because that's how it described the change, but it also described how the Attorney General promulgated instructions for carrying those out and that they were carried out by the U.S. Marshals Service.

And also I would point the Court to Exhibit E, which is the United Press article we cited. And in that article, the federal control was so strict that the head of jail administration, the person who would be doing it under state procedures, wasn't allowed to even be in the room without the approval of Washington, D.C.

So I think the historical --

THE COURT: Mr. Voit, can I rely on those two hearsay sources to interpret a federal statute?

MR. VOIT: I think the Court is allowed to look to undisputed historical practice. I certainly think the BOP Manual is an authoritative exposition on what federal protocols were. And I don't think -- And I would also point out, Your Honor, that the burden is not on the United States here. We are not asking Your Honor to perform some sort of relief, and we are not asking you to issue an order. It is the defendant who has to come to you with substantial authority that you should do something that no court has ever done, which is require the government to carry out an execution under a state protocol.

I would also point Your Honor to the context of this judgment itself. Judge Murguia entered this particular judgment in 2003 and then the amended judgment in 2004, exactly in the time frame when the federal government was carrying out executions, post-1994 executions, in a federal facility using federal protocols. And so I think it is very difficult to muster the argument that anybody at that time when this judgment was entered was envisioning that Mr. Mitchell's execution would be carried out in a way different than the three other executions that were contemporaneously being carried out under federal protocols in a federal facility.

THE COURT: Let me ask a follow-up question on that

point.

Do you contend -- and I'll ask the same question to defendants -- that Judge Murguia's judgment has any meaning different from the FDPA, or are they one in the same?

MR. VOIT: I believe she was attempting to incorporate -- that she did and was incorporating the language of the FDPA. I do not believe there is an intended difference.

THE COURT: Let me pause for a minute and ask Mr. Aminoff do you agree with that?

MR. AMINOFF: Yes, Your Honor, we do agree with that. I think the language of the judgment tracks the FDPA very closely.

THE COURT: Okay. Thanks. Back to you, Mr. Voit.

MR. VOIT: And that was the last point I intended to make about the historical practice, which is post-1994. There have been six executions. All have taken place in a federal facility. All have taken place under federal protocols.

Such an order to do something else would be the first time the federal government would ever be required by a court to do that. I think the defendant's burden is very heavy -- and he hasn't met it -- to show that there was this intended change.

And I will also touch very briefly on the serious consequences of the defendant's argument that we have to follow the exact same procedures as the state.

Obviously there are some states that have secrecy statutes. There are states with moratoria that dismantle their death chambers. There are states that don't update their protocols because they no longer use capital punishment even if it's still on the books. And there are definitely states that would wish to frustrate the federal government's ability to carry out federal executions.

And those are all reasons that would counteract, I think, quite strongly the notion that the federal government is required to follow dozens of different state protocols.

But I would turn then to Judge Rao's view, because there is obviously another way to look at this. And although we believe Judge Katsas was correct, we believe under Judge Rao's view that there is nothing about Arizona state law that is inconsistent with the federal protocol. Judge Rao herself emphasized how rare it would be for that to be the case.

And none of the four people, inmates whose executions were at issue in that case, qualified, including, I would note, for instance, the State of Arkansas, which we've talked about otherwise in our brief.

Arizona law just -- Arizona statute just provides for lethal injection. Arizona regulations from the DOC are exempt from the administrative rule-making procedure.

And the defendant has not provided any response to

Arizona's strong tradition of separation of powers. The law is for legislature, and implementation is for executive. And I think that's a very important point for Arizona purposes.

The government agrees that what the defendant cites is a contract. It is not something that could make law. I am sure that the Arizona Department of Corrections has contracts with vendors to, you know, fill up their vending machines. That is not the law of the state just because it is a binding contract entered into by a state agency.

The reason that the director was able to enter into that is precisely because he was not subject to formal rule making, and that was the kind of rule making that Judge Rao contemplated in her decision.

I would just briefly respond to something that is said in the reply brief about the *Chrysler Corporation* case, which has absolutely no application here. That was the case about whether something was authorized by law under a Trade Secrets Act and was talking about federal law anyway, which wouldn't be the law of the State of Arizona.

And I would also, on an alternative basis, point out that under Judge Tatel's view, nothing that the defendant has raised in any statutes or rule of criminal procedure would qualify as the law of the state. We think that the notice provision that's referred to, again, is not manner. It's certainly not effectuating the death. But it also, I think, is

strong evidence as to why the defendant's overarching argument is correct. It doesn't just say you get 35 days' notice. It says you go to the Arizona Supreme Court to get a warrant. How in the world could the federal government go to the Arizona Supreme Court to get a death warrant? There's no mechanism for us doing that.

I think that the defendant's overarching argument in pointing to some of these things shows why manner is talking about method and certainly not about everything that in any way involves capital punishment.

There's only three things that I could see in his brief that had anything to do with effectuating the death, and that involved qualifications, IV access, and expiration of drugs.

We've cited to some documents in the administrative record in the D.C. Circuit case. There is no showing -- Excuse me. The District of Columbia District Court case.

There is no showing of any risk of actual harm to him from any deviation in any of that stuff.

The government will not use expired drugs. It uses qualified personnel. It doesn't do exotic things. The defendant can posit hypotheticals. In fact, in all of these contexts, there's no conflict. He just says Arizona protocol has specifics here, and the federal protocol doesn't talk about them. That's not a conflict. It's certainly not something

that lets him stop his execution two weeks beforehand.

I didn't have more to say regarding the proper interpretation of the statute, Your Honor, but I would be remiss if I did not end with a brief discussion of the equitable posture that we are in.

By law the Court is required to consider the government's interest strong in this case. The federal government has succeeded in the direct appeal. It has succeeded in the habeas appeal. It has been 19 years since the defendant committed these crimes. The harm to the United States and to victim family members, including one particular family member who intends to go to Terre Haute and be there for the execution, and others who are sending a representative on their behalf, that is a real harm. And it is a real harm in continuing to delay punishment for somebody who committed these incredibly horrible, gruesome crimes almost 20 years ago.

And on the other side of the ledger, the equities, is a nebulous argument for an order that the government has never been required to follow before that identifies no specific real world harm.

That is not a proper basis for the injunctive relief that he seeks.

In the absence of any further questions --

THE COURT: All right.

MR. VOIT: -- we would ask that the motions be denied.

THE COURT: I do have a couple of questions for you, Mr. Voit. The defense in the motion asserted at the outset that I have jurisdiction to hear this motion. You didn't address that, but you certainly didn't dispute it.

I assume the government agrees that I have jurisdiction to resolve the two motions that are in front of me?

MR. VOIT: I do with the qualification of our footnote one to our second response, Your Honor, which is you have jurisdiction to issue an injunction that we follow a particular procedure or not.

We don't believe you would have jurisdiction to stay the judgment itself. That would be something that would have to be addressed in habeas.

So we interpret the defendant's motion, although he uses the word stay a number of times, to be seeking injunctive relief. And to the extent that that is the relief that he is seeking -- government, you're enjoined to seek one particular procedure or not -- then we would agree that Your Honor has jurisdiction.

To the extent that it is a request for a stay of the judgment, meaning we can't go forward with an execution at all on August 26th, then we believe that that would not be appropriate.

THE COURT: Okay. The last question for you concerns what's going on in the Ninth Circuit. I saw the decision that was entered yesterday by the Ninth Circuit. Where do you think that stands? What do you think is going to happen with that case in terms of a mandate issuing? And what if any effect do you think that has on what we're doing here?

MR. VOIT: I don't think that it has an effect on this particular question. We anticipate that the mandate will issue in a timely fashion. It certainly -- One would expect it to issue.

I mean, the government's view is that the mandate should have issued already, but one would expect that the mandate would issue at least within seven days of yesterday when the second petition for rehearing was denied. That will be in advance of his execution date.

The Solicitor General stands ready to respond to anything he files in the Supreme Court should he choose to do so. But we are not aware of or anticipating any other filings in that case unless something -- unless circumstances should change for some reason.

THE COURT: Okay. Thanks, Mr. Voit.

MR. VOIT: Thank you, Your Honor.

THE COURT: Mr. Aminoff -- You're welcome.

I would appreciate your thoughts, Mr. Aminoff, on that last question I just asked Mr. Voit, and then you can provide a

reply on any of the points he made.

MR. AMINOFF: The question about the Ninth Circuit, Your Honor?

THE COURT: Right.

MR. AMINOFF: So as Your Honor knows, they denied the petition for rehearing yesterday in accordance with the Ninth Circuit rules. I believe the mandate is supposed to issue seven days from yesterday. So that would be, what, Tuesday of next week. I think that's what will likely happen.

THE COURT: And the stay will be lifted?

MR. AMINOFF: I would expect that the stay would evaporate when the mandate issues.

THE COURT: Okay. All right.

Why don't you go ahead and address any points you wish to in reply.

MR. AMINOFF: Thank you, Your Honor. I'll try and keep it brief.

You know, one thing that really stood out to me in Mr. Voit's argument was his assurance to the Court that qualified personnel would carry out this execution.

And part of the problem here is that we don't know if that's true. We know if this execution took place in Arizona, that licensed people would be the ones who are inserting the needles and inserting the lines into Mr. Mitchell's body.

We have no idea who those people are going to be in

Indiana. We don't know what sorts of licenses they will have. In accordance with Indiana's protocol, it could very well be someone who might be a medical professional of some sort but hasn't inserted a line into someone's body in years and doesn't know how to do it and is going to mess it up and insert these drugs directly into Mr. Mitchell's tissue or muscle, and it will cause extreme pain and suffering.

Part of the reason why Congress changed things in the first place was to make this more humane. And protocols like Arizona's that have been time tested and judicially reviewed exist for that purpose.

The government is throwing together fairly quick protocol and rush through judicial review. Now, I understand the D.C. Circuit ruled against the petitioners and sent them to their executions last month. However, given the ruling of the court, you would have thought there would have been some kind of evidentiary hearing to try and determine whether those underlying statutes actually met Judge Rao's decision. And there really was very little fact finding on that point.

Discovery is actually still ongoing in the case. So I'm not sure if Mr. Voit's assurances that qualified personnel or unexpired drugs are going to be used are good enough, especially given the consequences of this case.

A few other points to raise, Your Honor. Mr. Voit sort of repeated over and over now that no court has ordered

the federal government to comply in detail with state law.

I think part of the reason for that is that the federal government has exercised the common sense up to this point to have people executed in the states.

I mean, the government conceded in D.C. that that was the practice, that from 1937 onwards, I think all but two federal executions took place in state facilities in accordance with state law.

So that's why there hasn't been a case that has actually made this order, because it hasn't really come up.

Now, I know the government has referred to the six executions in the modern era. The first three didn't challenge the lethal injection protocols, so that's Jones, McVeigh, and Garza. The second three did. And that's the subject of this D.C. case that we're now dealing with.

But, again, the D.C. Circuit did not find that manner means what the government wants it to mean. It didn't find that manner only refers to the top-line method. The majority of that court, as this Court well knows, did not make that finding. They found that manner meant a lot more than that.

A few other points, Your Honor. Mr. Voit didn't address the Rules of Criminal Procedure, and so I think there are in -- in Arizona. So I think there are additional areas that would qualify as binding law in Arizona that are not just what are in the materials that the Court's referred to as this

contract.

So even if the Court doesn't find that the materials in the procedure -- in the contract and the protocol are law, there are still those things that are somewhat in between, the Rules of Criminal Procedure, for example.

I'd just like to make a few really quick points about the delay. This is not an instance of serial litigation and serial stays and whatever else the government wants to call it. The government prematurely sought a warrant in this case and set an execution date for Mr. Mitchell. The Ninth Circuit has told them so.

So I wasn't filing multiple motions in this court last year. I filed one, bringing to the Court's attention that there was a pending appeal that the Ninth Circuit had issued a certificate of appealability on, and we had an established briefing schedule.

The government tried to rush the Ninth Circuit to a decision, and the Ninth Circuit specifically told them that we're not doing that.

So I don't think it's fair to say that we have delayed on this. I didn't file multiple motions in this court. I promptly brought the issue to the Court's attention, and then I took it to the Ninth Circuit after this Court ruled on it, that this Court found that it didn't have jurisdiction to decide on it.

So I don't think it's a fair characterization to say that we sat on anything, we bided our time, or whatever. We dealt with the issue in the Ninth Circuit. We got an order. And then once this matter became ripe before this Court this year, we promptly dealt with it again.

Just a few points of clarification on the D.C. suit. It has not been the case that Mr. Mitchell has been sort of sitting on the sidelines waiting to see what would happen.

Mr. Mitchell removed himself from that lawsuit several years ago now. It wasn't an instance of trying to sort of play games and see what happened. The government had been stalling for years issuing a new lethal injection protocol.

It wasn't a strategy to remove himself and see how it played out. I mean, it was a decision that he made, and it's played out the way that it has.

Your Honor, if I could just take one second to confer with my co-counsel and -- Excuse me one second.

THE COURT: That's fine.

MR. AMINOFF: Thank you, Your Honor. If the Court has any further questions, we'd appreciate hearing them.

THE COURT: I think we've covered all the questions that I had. Thank you, all, for your arguments.

As I mentioned, I'm going to do my best to get the decision out in this matter tomorrow or Friday so that you can move forward with the appeal. And that's the schedule on which

we will attempt to accomplish it.

Thank you, all.

MR. AMINOFF: Thank you, Your Honor.

MR. VOIT: Thank you, Your Honor.

(Proceedings recessed at 3:39 p.m.)

**C E R T I F I C A T E**

I, LINDA SCHROEDER, do hereby certify that I am duly appointed and qualified to act as Official Court Reporter for the United States District Court for the District of Arizona.

I FURTHER CERTIFY that the foregoing pages constitute a full, true, and accurate transcript of all of that portion of the proceedings contained herein, had in the above-entitled cause on the date specified therein, and that said transcript was prepared under my direction and control.

DATED at Phoenix, Arizona, this 12th day of August, 2020.

s/Linda Schroeder
Linda Schroeder, RDR, CRR

# EXHIBIT 2

**WO**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF ARIZONA**

United States of America,

Plaintiff,

v.

Lezmond Mitchell,

Defendant.

No. CR-01-01062-001-PCT-DGC

**ORDER**

Defendant Lezmond Mitchell has filed a motion to strike his execution warrant, vacate his execution date, and enjoin violation of this Court's January 8, 2004 Judgment (Doc. 606), and a motion to stay his execution pending resolution of the first motion (Doc. 609). The United States has filed responses opposing both motions (Docs. 611, 612), and Mr. Mitchell has filed a reply (Doc. 613). A hearing on the motions was held on August 12, 2020. The Court will deny both motions.

**I. Procedural History.**

In 2003, a jury convicted Mr. Mitchell of first-degree murder, felony murder, carjacking resulting in death, and related federal crimes arising out of the 2001 kidnapping and murder of a 63-year-old grandmother and her 9-year-old granddaughter.[1] The jury unanimously recommended a sentence of death on the federal carjacking count.

On September 15, 2003, Judge Mary Murguia sentenced Mr. Mitchell to death and issued a Judgment that included the following provision:

[1] A detailed discussion of the facts surrounding the crimes and Mr. Mitchell's trial can be found at *United States v. Mitchell*, 502 F.3d 931, 942 (9th Cir. 2007).

> Pursuant to the Federal Death Penalty Act of 1994, specifically, Section 3594 of Title 18 of the United States Code, pursuant to the jury's special findings returned on May 20, 2003, and pursuant to the jury's unanimous vote recommending that the defendant be sentenced to death, IT IS THE JUDGMENT OF THIS COURT THAT the defendant, Lezmond Charles Mitchell, be sentenced to death on Count Two of the Second Superseding Indictment. The judgment and death sentence on Count Two is supported by independent verdicts with regard to each victim. Furthermore, pursuant to Title 18, Section 3596 of the United States Code, the defendant is hereby committed to the custody of the Attorney General of the United States until exhaustion of the procedures for appeal of the judgment and conviction and for review of the sentence. When the sentence is to be implemented, the Attorney General shall release the defendant to the custody of the United States Marshal, who shall supervise implementation of the sentence in the manner prescribed by the law of the State of Arizona.

Doc. 425. The Court subsequently amended its Judgment on January 8, 2004, but left the above portion of the order unchanged. Doc. 466. The Judgment was affirmed on appeal and has not been altered as a result of Mr. Mitchell's subsequent habeas petitions.[2]

On July 25, 2019, T.J. Watson, the warden of the Federal Correctional Complex at Terre Haute, Indiana, served Mr. Mitchell with a letter indicating that, pursuant to 28 C.F.R. § 26.3(a)(1), the Director of the Bureau of Prisons ("BOP") had set December 11, 2019, as Mr. Mitchell's execution date ("2019 Letter"). The same day, in four pending federal lethal injection lawsuits in the District Court for the District of Columbia, the Government filed a notice indicating that it had adopted a revised lethal injection protocol for federal death penalty sentences. Doc. 606-1, BOP Addendum.

On October 4, 2019, Mr. Mitchell's execution was stayed by the Ninth Circuit pending its consideration of his appeal from this Court's denial of a Rule 60(b) motion. *Mitchell v. United States*, No. 18-17031 (9th Cir. Oct. 4, 2019), ECF No. 26. The Ninth Circuit ultimately affirmed the Court's denial. *Id.* (Apr. 3, 2020), ECF No. 37.

On July 29, 2020, Warden Watson served Mr. Mitchell with a letter stating that the BOP had set a new execution date of August 26, 2020 ("2020 Letter"). Doc. 606-2. Eight

[2] Throughout his motion, Mr. Mitchell refers to the Judgment date as January 8, 2003. *See* Doc. 606. The amended Judgment was entered on January 8, 2004. Doc. 466.

days later, Mr. Mitchell filed his motion to strike the execution warrant and vacate his execution date. Doc. 606.

## II. Motion to Stay.

Mr. Mitchell asks the Court to stay his execution "until the resolution of his motion" to vacate the execution date. Doc. 609 at 15.[3] Because the Court resolves that motion in this order, it will deny the motion to stay as moot.[4]

## III. Motion to Strike, Vacate, and Enjoin.

Mr. Mitchell asks this Court to vacate the August 26, 2020 execution date and enjoin the government from attempting to execute him "in a manner that violates this Court's judgment." Doc. 606 at 6.

### A. Timeliness.

The government asserts that Mr. Mitchell's motion is untimely. It argues that he "has known about the federal government's current execution protocol since July 25, 2019, when the Department of Justice adopted it, filed it in the District of Columbia litigation challenging the protocol's validity, and delivered him notice of the United States' intent to carry out his sentence pursuant to federal regulations." Doc. 611 at 3. The government asserts "[t]here is no reason Mitchell could not have raised this issue a year ago, when his execution was first scheduled, which would have allowed for fair briefing, court consideration, and reasonable appeals." *Id.* at 5.

Mr. Mitchell received notice of his December 2019 execution date on July 25, 2019, while he had an appeal pending before the Ninth Circuit related to this Court's denial of his Rule 60(b) motion. Shortly thereafter, on August 5, 2019, he asked this Court to stay his execution pending resolution of the appeal. Motion to Stay Execution, *Mitchell v.*

[3] This order cites to page numbers placed at the top of each page by the Court's electronic case filing system, not to page numbers in the original documents.

[4] During the hearing, counsel for Mr. Mitchell asked the Court to stay his execution pending appeal of the Court's decision. That request was not made in Mr. Mitchell's motion (Doc. 609), and the standard for such a stay has not been briefed by the parties. The Court accordingly will not address the request. Mr. Mitchell can take up the stay question with the Ninth Circuit, as he did in his previous appeal from this Court.

*United States*, No. 3:09-cv-8089-DGC (D. Ariz. Aug. 5, 2019), ECF. No. 84. The Court denied the motion on jurisdictional grounds, *id.* (Aug. 30, 2019), ECF. No. 92, and Mr. Mitchell filed a motion to stay his execution in the Ninth Circuit on September 9, 2019. That motion was granted on October 4, 2019. *Mitchell v. United States*, No. 18-17031 (9th Cir. Oct. 4, 2019), ECF No. 26. The Court cannot conclude that Mr. Mitchell was required to proceed with additional challenges to his execution when it was stayed. Mr. Mitchell received notice of his new execution date on July 29, 2020, and filed this motion days later.

Additionally, at a status conference on August 15, 2019, after issuance of the 2019 Letter, the government acknowledged to the Court that its intent was to conduct the execution in Indiana, but stated that it was "not prepared to respond" to the Court's query about whether the execution would follow Arizona state procedures. Doc. 606-6 at 084–85; RT 08/15/19 at 10–11. Thus, the issue raised in this motion – whether the government can legally conduct Mr. Mitchell's execution without following Arizona procedures – was not ripe until Mr. Mitchell was served with the 2020 Letter.

**B. Meaning of the Federal Death Penalty Act ("FDPA").**

Congress enacted the FDPA in 1994. The statute looks to state law for the "manner" of implementing federal death sentences:

> When the sentence is to be implemented, the Attorney General shall release the person sentenced to death to the custody of a United States marshal, *who shall supervise implementation of the sentence in the manner prescribed by the law of the State in which the sentence is imposed.* If the law of the State does not provide for implementation of a sentence of death, the court shall designate another State, the law of which does provide for the implementation of a sentence of death, and the sentence shall be implemented in the latter State in the manner prescribed by such law.

18 U.S.C. § 3596(a) (emphasis added).

The Judgment in this case uses essentially the same language. It provides that the execution shall be conducted "in the manner prescribed by the law of the State of Arizona." Doc. 466.

The parties dispute the meaning of these phrases. The government maintains that by requiring it to implement Mr. Mitchell's execution "in the manner prescribed" by Arizona law, the FDPA merely requires it to use Arizona's "top-line" choice of execution method – lethal injection. Doc. 611 at 6–13. Mr. Mitchell argues that "implementation . . . in the manner prescribed" by Arizona law incorporates all of Arizona's detailed execution procedures. Doc. 606 at 9. And because the execution protocol issued by the federal government in 2019 ("2019 Protocol") does not follow those procedures, Mr. Mitchell contends that his execution under the 2019 Protocol would violate the FDPA. *Id.*[5]

Both parties rely heavily on a recent decision of the D.C. Circuit, *In re Fed. Bureau of Prisons' Execution Protocol Cases* (*Execution Protocol Cases*), 955 F.3d 106 (D.C. Cir. 2020), *cert. denied sub nom. Bourgeois v. Barr*, No. (19A1050), 2020 WL 3492763 (U.S. June 29, 2020). The plaintiffs in that case were four federal death row inmates who challenged the 2019 Protocol. The district court preliminarily enjoined their executions, holding that "the FDPA gives decision-making authority regarding 'implementation'" of federal death sentences to states, and, therefore, the 2019 Protocol's uniform federal implementation procedure is "not authorized by the FDPA." *In re Fed. Bureau of Prisons' Execution Protocol Cases*, No. 1:19-mc-145, 2019 WL 6691814, at *4, *7 (D.D.C. Nov. 20, 2019). The court found that the FDPA language requiring executions to be conducted "in the manner prescribed" by state law applied not just to the general execution method, but also to "procedural details" like how the "catheter is to be inserted." *Id.* at *4, *6.

The D.C. Circuit reversed, with two members of the panel finding that the district court misconstrued the FDPA. *Execution Protocol Cases*, 955 F.3d at 108. The circuit court summarized its core holding as follows:

> Judge Katsas concludes that the FDPA regulates only the top-line choice among execution methods, such as the choice to use lethal injection instead of hanging or electrocution. Judge Rao concludes that the FDPA also requires the federal government to follow execution procedures set forth in

---

[5] Although Mr. Mitchell asserts that his execution would violate both the FDPA and the Court's Judgment, his legal analysis relies entirely on the meaning of the FDPA. Neither he nor the government argues that the Judgment has a different meaning. This order accordingly focuses entirely on the FDPA.

> state statutes and regulations, but not execution procedures set forth in less formal state execution protocols. Judge Rao further concludes that the federal protocol allows the federal government to depart from its procedures as necessary to conform to state statutes and regulations. On either of their views, the plaintiffs' primary FDPA claim is without merit.

*Execution Protocol Cases*, 955 F.3d at 112.

Judge Tatel dissented. He agreed with Judge Rao "that the term 'manner' refers to more than just general execution method," but concluded that the statute also incorporates informal execution protocols if "issued by state prison officials pursuant to state law." *Id.* at 146 (Tatel, J., dissenting).

Mr. Mitchell cites the opinions of Judges Rao and Tatel to support his view that "manner" in the FDPA means more than the top-line method of execution. Doc. 606 at 11. On this issue, the Court agrees with Mr. Mitchell.

The starting point is the Crimes Act of 1790, which specified that "the manner of inflicting the punishment of death, shall be by hanging the person convicted by the neck until dead." Crimes Act of 1790, ch. 9, § 33, 1 Stat. 112, 119. "Manner" as used in this phrase clearly means only the general method of execution – hanging. Judge Katsas tracked the word "manner" from the 1790 Act to the 1937 statute that replaced it. 955 F.3d at 115–18 (Katsas, J., concurring). The 1937 statute continued to use the word "manner," but did not specify a single method of execution. Instead, it provided that "[t]he manner of inflicting the punishment of death shall be the manner prescribed by the laws of the State within which the sentence is imposed." *See* An Act To Provide for the Manner of Inflicting the Punishment of Death, Pub. L. No. 75-156, 50 Stat. 304 (1937). Judge Katsas reasoned that because "manner" meant the general method of execution in the 1790 statute, it must also have meant the general method of execution in the 1937 statute, particularly because both statutes refer to "the manner of inflicting the punishment of death." 955 F.3d at 116. The government and Judge Katsas also note that the Supreme Court in *Andres v. United States*, 333 U.S. 740, 745 & n.6 (1948), stated that the 1937 statute was "prompted by the fact that 'Many States . . . use(d) more humane *methods* of execution, *such as electrocution,*

*or gas*" and "it appear(ed) desirable for the Federal Government likewise to change its law *in this respect*." *Id.* (quoting H.Rep. No. 164, 75th Cong., 1st Sess., 1 (1937)) (emphases added).

Although this view has some merit, the Court ultimately finds it unpersuasive because the 1937 statute fundamentally changed the way in which federal death penalty sentences were carried out. It shifted the focus from a single federal method – hanging – to a range of approaches used by the States. And Congress's intent to adopt more humane methods of execution certainly does not exclude the possibility that Congress intended to incorporate details of state executions that made them more humane. The 1937 Act further stated that the "marshal charged with the execution of the sentence may use available State or local facilities and the services of an appropriate State or local official" to perform the execution. An Act To Provide for the Manner of Inflicting the Punishment of Death, Pub. L. No. 75-156, 50 Stat. 304 (1937). This contemplated at least the possibility of a wholesale use of state execution procedures.

In fact, that is what happened. As Judge Rao explained:

> In practice, . . . the federal government incorporated more than the state's method of execution when it carried out executions under the 1937 statute. The government concedes that nearly all executions conducted under the 1937 statute took place in state facilities. Presumably, those executions were carried out in accordance with state law and possibly with other state procedures. DOJ notes that three executions under the 1937 statute took place in federal facilities, but DOJ is unable to identify a single way in which the executions were otherwise inconsistent with state law.

955 F.3d at 137 (Rao, J., concurring) (citation omitted).

To further support Judge Katsas's view, the government cites two newspaper articles to suggest that federal procedures were in fact used in executions under the 1937 Act. One article stated that inmates were to "be executed by whatever method is prescribed by the law of the State," but that the Department of Justice ("DOJ") would provide "all U.S. Marshals instructions for carrying out executions" and those procedures would govern "[u]nless [a] court specifies otherwise." Doc. 611-4 (Associated Press, U.S. Arranging To

Execute Five, June 17, 1938). Another article noted that the government's supervision over an execution was "so strict" that the local sheriff "was forced to obtain special permission from Washington to be present." Doc. 611-5 (United Press, Seadlund Will Die Tonight, July 13, 1938).

These brief accounts are not only hearsay, they lack the detail necessary to determine what procedures were actually used in the executions. The government relies on *Norwegian Nitrogen Prods. Co. v. United States*, 288 U.S. 294, 315 (1933), for the proposition that agency "practice" has "peculiar weight when it involves a contemporaneous construction of a statute by [those] charged with the responsibility of setting its machinery in motion." *Id.*; Doc. 611 at 11–12. But the Court is not persuaded that two short newspaper articles can be relied upon to establish the execution practice under the 1937 statute, particularly in light of the government concessions cited by Judge Rao above and a 1994 letter from Attorney General Janet Reno described below.

The government also cites a Federal Bureau of Prisons' 1942 Manual of Policies and Procedures which stated that the 1937 Act's "manner" provision "refers to the method of imposing death, whether by hanging, electrocution, or otherwise, and not to other procedures incident to the execution prescribed by the State law." *See* Doc. 611-6. But this statement is not "practice" as required by *Norwegian Nitrogen*, and the record before the D.C. Circuit suggested that virtually all executions under the 1937 Act were held in state facilities. 955 F.3d at 137 (Rao, J., concurring); *id.* at 148 (Tatel, J., dissenting).

The continuing history provides additional insight. The 1937 statute was repealed by the Sentencing Reform Act of 1984, Pub. L. No. 98-473, § 212, 98 Stat. 1987, and for the next several years the United States had no statute that specified a method for federal death sentences. DOJ promulgated regulations in 1993 that adopted lethal injection as the uniform federal execution method with specific federal procedures. 58 Fed. Reg. 4898, 4901–02 (1993) (codified at 28 C.F.R. § 26.3). At the time, DOJ hypothesized "that Congress might have repealed the 1937 statute because it 'no longer wanted the federal method of execution dependent on procedures in the states, some of which were

increasingly under constitutional challenge.'" 58 Fed. Reg. at 4,899. This statement again suggests that state procedures were used under the 1937 Act.

Significantly, when Congress passed the FDPA in 1994, it did not choose to retain the single-method approach of the existing DOJ regulations. Congress chose instead to return to the 1937 model, providing that the "United States marshal . . . shall supervise implementation of the [death] sentence in the manner prescribed by the law of the State in which the sentence is imposed." 18 U.S.C. § 3596(a). Attorney General Janet Reno wrote to Congress shortly before the FDPA was passed and noted that it "contemplate[d] a return to an earlier system in which the Federal Government does not directly carry out executions, but makes arrangements with states to carry out capital sentences in Federal cases." *See* H.R. Rep. No. 104-23, at 22 (1995) (quoting Letter from Attorney General Janet Reno to Hon. Joseph R. Biden, Jr., at 3–4 (June 13, 1994)). Her statement confirms that the federal government's practice under the 1937 Act was to use state procedures for federal executions. She then "recommend[ed] amendment of the legislation to perpetuate the current approach, under which the execution of capital sentences in Federal cases is carried out by Federal officials pursuant to uniform regulations issued by the Attorney General." *Id.* Congress disregarded her request and returned to the 1937 model.

In light of this history, the Court cannot conclude that the 1790 use of the word "manner" remained intact until it found its way into the FDPA. Congress deliberately chose in 1994 to revert from a single-method execution approach, like that adopted in 1790 and in the 1993 DOJ regulations, to the state-focused approach of the 1937 statute. And it did so in the face of Attorney General Reno's assertion that federal executions under the 1937 statute had occurred in state facilities. This history suggests that Congress knowingly adopted an approach in the FDPA that looked to state law and procedures for the means of execution. It does not support the government's contention that the FDPA entrusted all execution details to federal officers and looked to state law solely for the general method of execution.

/ / /

### C. To What State Law Does the FDPA Look?

The Court must next decide what level of state procedures Congress intended to embrace in the FDPA. Judges Rao and Tatel differ on what constitutes the "law of the State" for purposes § 3596(a). Judge Rao would limit it to execution procedures set forth in state "statutes and formal regulations." 955 F.3d at 129 (Rao, J. concurring). In her opinion, by directing the federal government to look to the *law* of the State, the FDPA requires the government to "follow all procedures prescribed by state statutes and formal regulations, but no more." *Id.* at 134 (Rao, J., concurring). Judge Tatel takes a more expansive view, finding that the "law of the State" also includes "protocols issued by state prison officials pursuant to state law." *Id.* at 146 (Tatel, J., dissenting). The Court agrees with Judge Rao.

Judge Tatel writes:

> The "law" of each state, then, requires executions to be implemented according to procedures determined by state corrections officials, who, in turn, have set forth such procedures in execution protocols. In other words, "by law," each state directed its prison officials to develop execution procedures, and "by law," those officials established such procedures and set them forth in execution protocols. Accordingly, the protocols have been "prescribed by . . . law."

955 F.3d at 147 (Tatel, J., dissenting).

This analysis places too little weight on the key word "prescribed." Under the FDPA, the state law must not just authorize or direct that the manner of death be set forth by correction officials in a state protocol, the state law must "prescribe[]" the manner of death to be followed in federal executions: "[the marshal] shall supervise implementation of the sentence in the *manner <u>prescribed</u> by the law of the State* in which the sentence is imposed." 18 U.S.C. § 3956(a) (emphasis added).

"Prescribe" means "to lay down a rule," to "dictate." *Merriam-Webster.com Dictionary*, Merriam-Webster, https://www.merriam-webster.com/dictionary/prescribe (last visited Aug. 12, 2020). It means "to tell someone what they must have or do." *Cambridge Dictionary*, https://dictionary.cambridge.org/us/dictionary/english/prescribe

(last visited Aug 12, 2020). A state statute that, in the words of Judge Tatel, merely "direct[s] its prison officials to develop execution procedures" does not "prescribe," "lay down," or "dictate" those procedures. 955 F.3d at 147 (Tatel, J., dissenting).

To support his interpretation, Judge Tatel looks to the purpose of the FDPA – which he equates to the purpose of the 1937 Act from which its language was taken – which is to make executions more humane by adopting the more advanced procedures used by the States. 955 F.3d at 148 (Tatel, J., dissenting). Judge Rao correctly responds, however, that courts cannot depart from the plain meaning of a statute (in this case, the word "prescribed") in the interest of more fully promoting the statute's purpose. *Id.* at 140–41 (Rao, J., concurring). "[O]ur function [is] to give the statute the effect its language suggests," not to further whatever "admirable purposes it might be used to achieve." *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 270 (2010). "[I]t frustrates rather than effectuates legislative intent simplistically to assume that *whatever* furthers the statute's primary objective must be the law." *Pension Ben. Guar. Corp. v. LTV Corp.*, 496 U.S. 633, 646–47 (1990) (emphasis in original).

In concluding that state "law" does not include informal execution protocols, Judge Rao relies on *Chrysler Corp. v. Brown*, 441 U.S. 281 (1979). In that case the Supreme Court considered a provision of the Trade Secrets Act that protected confidential information by prohibiting its disclosure unless "'authorized by law.'" *Id.* at 294 (quoting 18 U.S.C. § 1905). The Supreme Court held that a regulation issued pursuant to an agency's "housekeeping" statute and without notice-and-comment procedures did not qualify as "law" under the Act. *Id.* at 309–16. From this, Judge Rao concludes that the word "law" in § 3596(a) does not include informal state protocols, but is limited to "binding law prescribed through formal lawmaking procedures." 955 F.3d at 132 (Rao, J., concurring).

Judge Tatel responds that "prescribed by law" and similar phrases appear more than 1,200 times in the United States Code and have no single meaning, but must instead be interpreted in context. 955 F.3d at 149 (Tatel, J., dissenting). He then turns again to the

overall purpose of the FDPA – to adopt more humane state execution procedures – and concludes that excluding state protocols from the requirement of the FDPA would defeat the statute's purpose. But this analysis glosses over the actual language at issue – "prescribed by law." Judge Tatel does not assert that informal state protocols constitute "law," and, as Judge Rao notes, Judge Tatel cites no case where such informal procedures have been held to have the force of law. 955 F.3d at 143 n.15 (Rao, J., concurring).

Because the FDPA directs the federal government to impose the death penalty "in the manner *prescribed by the law of the State*," only those execution procedures actually prescribed by state law – state statutes and regulations that have the force and effect of law – must be applied in a federal execution. Procedures contained in less formal state protocols simply are not "the law of the State." 18 U.S.C. § 3596(a).

**D. What is Arizona "Law" for Purposes of the FDPA?**

Mr. Mitchell asserts that Arizona's execution protocol, found in Arizona Department of Corrections, Rehabilitation and Reentry ("ADC") Department Order 710 ("DO 710"), constitutes Arizona "law" within the meaning of the FDPA, and that the government therefore is required to comply with it fully during his execution. He makes two arguments in support.

First, Mr. Mitchell's motion notes briefly that an "Arizona statute provides that the method of execution is lethal injection to occur 'under the supervision of the state department of corrections.'" Doc. 606 at 14 (quoting A.R.S. § 13-757). Mr. Mitchell asserts that ADC drafted DO 710 "[p]ursuant to that authority," and, "[a]ccordingly, these protocols are part of Arizona law." *Id.* But state statutes frequently direct state agencies to take action, and Mr. Mitchell cites no authority for the proposition that a protocol issued in response to such a legislative direction automatically constitutes state law. Certainly A.R.S. § 13-757, which states only that executions are to occur "under the direction" of ADC, does not say that all procedures adopted by ADC therefore have the force of law.

Mr. Mitchell also notes that DO 710 cites various statutes. *Id.* (citing Doc. 606-3 at 25). But the statutes cited in DO 710 do not concern the legal effect of the department

order. Instead, they include provisions defining the word "person" (A.R.S. §§ 1-215(28), 13-105(30)); stating that a person sentenced before November 23, 1992, may choose either lethal injection or lethal gas as the means of execution (A.R.S. § 13-757(B)); providing that the identities of executioners are kept confidential (A.R.S. § 13-757(C)); stating who may be present at executions (A.R.S. § 13-758); requiring that the ADC director provide a return of warrant to the courts after an execution (A.R.S. § 13-759); and addressing the competency of persons to be executed (A.R.S. §§ 13-4021 through 13-4026).[6] Doc. 606-3 at 25. None of these statutes states that department orders issued by ADC have the force and effect of law; indeed, none directly concerns ADC's issuance of orders. They instead are statutes that touch on topics addressed in DO 710. Mr. Mitchell cites no authority suggesting that mere citation of these statutes somehow makes DO 710 part of Arizona law.[7]

Second, Mr. Mitchell notes that prior versions of DO 710 contained language stating that they did not "create any enforceable legal rights or obligations." In 2017, in a lawsuit pending in this Court, ADC entered into a settlement agreement with the plaintiffs, including several death row inmates, and agreed to exclude such language from future protocols. Doc. 606-4, Stipulation and Order from *First Amendment Coalition of Arizona, Inc. v. Ryan*, D. Ariz. Case No. 2:14-cv-01447-NVW. Mr. Mitchell contends that this stipulation distinguishes DO 710 from the protocols litigated in the D.C. Circuit, which,

---

[6] The list also includes a citation to Ariz. R. Crim. P. 31.17(c)(3), which at the time DC 710 was issued apparently concerned notifications to the Arizona Supreme Court about the date and time of execution. That provision now appears to be in Rule 31.23.

[7] Mr. Mitchell never addresses Arizona administrative law concerning agency rulemaking, such as the Arizona Administrative Procedures Act, A.R.S. § 41-1001, *et seq*., to show that DO 710 is an agency regulation with the force and effect of law. His motion and reply brief are entirely silent on this subject. *See* Docs. 606, 613. The Court also notes that DO 710 is one of more than 125 Department Orders issued by ADC. *See* https://corrections.az.gov/reports-documents/adcrr-policies/department-orders-index (last visited August 11, 2020). These orders cover a wide variety of prison-related topics, from housing to visitation to medical care. *Id.* Department Order 101 sets the procedures for drafting and reviewing Department Orders, and suggests that the process is entirely internal. *See* https://corrections.az.gov/sites/default/files/policies/100/0101071320.pdf (last visited August 11, 2020). The Court further notes that the ADC Department Orders are not included in the Arizona Administrative Code. *See* https://apps.azsos.gov/publicservices/Title_05/5-01.pdf (last visited August 11, 2020). Mr. Mitchell addresses none of this.

because they "do not appear to have the binding force of law, cannot be deemed part of the 'law of the State.'" 955 F.3d at 143 n.15 (Rao, J., concurring.) Mr. Mitchell argues, therefore, that the "Arizona law" governing the manner of state executions includes DO 710. Doc. 606 at 14.

The Court is not persuaded. The *First Amendment Coalition* case was resolved by a Settlement Agreement – a contract – which the parties agreed could be enforced by other persons sentenced to death in Arizona. The Settlement Agreement provided:

> [T]he parties intend this Stipulated Settlement Agreement to be enforceable by, and for the benefit of, not only Plaintiffs but also all current and future prisoners sentenced to death in the State of Arizona ("Condemned Prisoner Beneficiaries"), who are express and intended third-party beneficiaries of this Stipulated Settlement Agreement[.]

Doc. 606-4 at 7.

The remaining provisions of the stipulation make clear that the parties viewed the Settlement Agreement as a binding contract between ADC and death row inmates. It identifies seven specific "covenants" by ADC that are enforceable (*id.* at 4–8), provides that the court may take action upon "breach" of the Settlement Agreement (*id.* at 8), provides that the case can be reopened at the request of a third-party beneficiary (*id.* at 7–8), and provides that "an injunction shall immediately issue in this action or in a separate action for breach of this Stipulated Settlement Agreement" (*id.* at 10). In short, the *First Amendment Coalition* case was resolved in the same manner as many other lawsuits – by a binding contract that could be enforced in court by specific parties and third-party beneficiaries.

The stipulation says nothing about creating Arizona law, and Mr. Mitchell cites no authority for the proposition that a settlement agreement between litigants creates Arizona law. True, the Settlement Agreement includes a covenant that present and future versions of DO 710 would not say that they do not "create any legally enforceable rights or obligations" (*id.* at 3), but the reason for this covenant is readily apparent – the parties

intended to establish legally enforceable contract rights and such language would be inconsistent with their agreement.

The Court cannot conclude that the Settlement Agreement makes DO 710 the "law" of Arizona within the meaning of the FDPA. The settlement is a contract, not a statute or formal regulation. Mr. Mitchell cites nothing to suggest that Congress intended "the law of the State" to include contracts. The Court accordingly holds, for purposes of the FDPA, that the "law" of Arizona includes Arizona's death penalty statutes and criminal rules, but that Mr. Mitchell has failed to show that it also includes DO 710.[8]

**E. What Does Arizona Law Require in this Case?**

To resolve the merits of Mr. Mitchell's motion, the Court must compare the requirement of the BOP's 2019 Protocol to Arizona's death penalty statutes and criminal rules to see if there is inconsistency. Mr. Mitchell cites three differences. Doc. 606 at 17. First, under Arizona law, a prisoner is entitled to 35 days' notice of his execution date, A.R.S. § 13-759, while the BOP protocol provides only 20 days' notice, 28 C.F.R. § 26.4(a). Second, a prisoner may have five witnesses at his execution under Arizona law, A.R.S. § 13-758, but only three under the BOP protocol, 28 C.F.R. § 26.4(c–d). Third, Arizona Rule of Criminal Procedure 31.23 allows for up to a 60-day delay if the execution is deemed by the Arizona Supreme Court to be "impracticable," while the BOP protocol permits delay only upon a court-ordered stay, 28 C.F.R. § 26.3(a)(1).

Although these three state procedures differ from the 2019 Protocol, the Court concludes that they are not the kinds of procedures incorporated by the FDPA. The FDPA

[8] Counsel for Mr. Mitchell argued at the hearing that not requiring the government to follow state protocol procedures in this case would create a "paradox" between the first and second sentences of § 3596(a). The Court does not see the paradox. The first sentence, which applies when a defendant is convicted in a state such as Arizona that imposes the death penalty, provides that the marshal "shall supervise implementation of the sentence in the manner prescribed by the law of the State[.]" 18 U.S.C. § 3596(a). The second sentence, which applies when a defendant is convicted in a state that does not impose the death penalty, provides that "the court shall designate another State, the law of which does provide for the implementation of a sentence of death, and the sentence shall be implemented in the latter State in the manner prescribed by such law." *Id.* Both sentences require that the government implement the sentence "in the manner prescribed" by the state's law. Thus, the Court's interpretation of that phrase would apply in both sentences, producing no paradox.

calls for "*implementation of the sentence* in the manner prescribed by the law of the State[.]" 18 U.S.C. § 3596(a) (emphasis added). The sentence, of course, is death, and the "manner" of "implementation" of that sentence is the procedures by which death is caused. The Court cannot conclude that matters unrelated to the procedures for effectuating death constitute the manner of implementing the death sentence as referred to in the FDPA. Other judges agree. A unanimous panel of the Seventh Circuit recently held that "Section 3596(a) cannot be reasonably read to incorporate every aspect of the forum state's law regarding execution procedure. We do not understand the word 'manner' as used in § 3596(a) to refer to details such as witnesses. The word concerns how the sentence is carried out, not who watches." *Peterson v. Barr*, 965 F.3d 549, 554 (7th Cir. 2020). In the D.C. Circuit case, even Judge Tatel found that § 3596(a) requires the federal government to follow only "those procedures that effectuate the death, including choice of lethal substances, dosages, vein-access procedures, and medical-personnel requirements." *Execution Protocol Cases*, 955 F.3d at 151 (Tatel, J., dissenting).

Mr. Mitchell identifies no procedures in Arizona statutes or criminal rules concerning the means for effectuating death that conflict with the BOP protocol. The Court therefore concludes that the government's planned method of execution is not inconsistent with the salient provisions of Arizona law.[9]

**IT IS ORDERED:**

1. Mr. Mitchell's motion to strike his execution warrant, vacate his execution date, and enjoin violation of this Court's Judgment (Doc. 606) is **denied**.

2. Mr. Mitchell's motion to stay his execution (Doc. 609) is **denied**.

Dated this 13th day of August, 2020.

David G. Campbell
Senior United States District Judge

[9] By addressing the parties' legal arguments dispassionately in this order, the Court does not mean to minimize the difficult and vexing human issues on both sides of this case.