**C.A. No. 20-99009**
**CAPITAL CASE**

D. Ct. No. 3:01-cr-01062-DGC

**UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

LEZMOND C. MITCHELL,

Defendant-Appellant.

ON APPEAL FROM AN ORDER OF THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF ARIZONA

# RESPONSE TO EMERGENCY MOTION TO STAY EXECUTION

MICHAEL BAILEY
United States Attorney
District of Arizona

KRISSA M. LANHAM
Appellate Division Chief

WILLIAM G. VOIT
Assistant U.S. Attorney
Two Renaissance Square
40 N. Central Avenue, Suite 1800
Phoenix, Arizona 85004-4449
Telephone: (602) 514-7500
Attorneys for Respondents/Appellees

Date Submitted via ECF: August 16, 2020

Next week, on August 26, 2020, Defendant-Appellant Lezmond C. Mitchell is scheduled to be executed by the federal Bureau of Prisons (BOP) for the 2001 carjacking and murder of a grandmother and her nine-year-old granddaughter. On August 6, 2020—more than 17 years after he was sentenced, more than a year after his execution was initially scheduled, and despite having voluntarily withdrawn from other litigation timely presenting the issue—Mitchell filed a motion contending that his execution under BOP's lethal-injection protocol violates the Federal Death Penalty Act (FDPA). The district court rightly declined to stop the execution on that basis, and Mitchell's request in this Court likewise lacks merit.

The core of Mitchell's argument is that the FDPA requires federal officials to carry out his execution using *all* state death-penalty procedures, down to minutiae like the color of syringe labels and the number of witnesses present. But Mitchell identifies no textual, historical, or practical ground to support his sweeping view of the FDPA, which two federal courts of appeals have recently rejected and which the Supreme Court declined to accept as a basis to stay three federal executions conducted last month. Indeed, although federal appellate judges have differed on the exact scope of the FDPA's requirement that federal executions be conducted in the "manner" prescribed by state law, no appellate judge has accepted Mitchell's reading. And although federal statutes have addressed the required "manner" of execution since 1790, no federal execution in United States history has ever been

constrained by state procedures in the way Mitchell suggests. Mitchell thus falls far short of the showing of likely success on the merits required to justify entry of a stay.

Particularly given the expedited timetable, this Court need not adopt a definitive interpretation of the FDPA. Even under the middle-ground approach taken by the district court—a position more favorable to Mitchell than the government's reading—Mitchell's claim fails on the merits. Mitchell's motion does not address, much less refute, the district court's reasoning under that approach. Moreover, Mitchell identifies no equitable factors that would support "last-minute intervention" here, which the Supreme Court has emphasized "'should be the extreme exception, not the norm.'" *Barr v. Lee*, No. 20A8, 2020 WL 3964985, at *2 (U.S. July 14, 2020) (quoting *Bucklew v. Precythe*, 139 S. Ct. 1112, 1134 (2019)). Not only is Mitchell's claim profoundly untimely given his deliberate withdrawal from parallel litigation, but his assertion of minor procedural differences between the federal lethal-injection protocol and Arizona's lethal-injection protocol does not constitute meaningful irreparable harm.

Thus, whether looking to the likelihood of success on the merits or the balance of equities, Mitchell cannot prevail in his appeal from the district court's denial of injunctive relief. (*See* Dkt. 7 (directing parties to focus on Mitchell's appeal).) His motion for a stay pending that appeal should be denied, and his execution should be allowed to "proceed as planned." *Lee*, 2020 WL 3964985, at *2.

## DISCUSSION

"A stay is not a matter of right, even if irreparable injury might otherwise result to the appellant." *Virginian Ry. Co. v. United States*, 272 U.S. 658, 672 (1926). Rather, "a stay of execution is an equitable remedy," and "equity must be sensitive to the" government's "important interest in the timely enforcement of a sentence." *Hill v. McDonough*, 547 U.S. 573, 584 (2006). Thus, the Supreme Court has emphasized that last-minute stays of execution "should be the extreme exception, not the norm." *Lee*, 2020 WL 3964985, at *2 (citation omitted).

To obtain a stay of execution, an inmate "must demonstrate (1) that he is likely to succeed on the merits of such a claim, (2) that he is likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in his favor, and (4) that an injunction is in the public interest." *Beaty v. Brewer*, 649 F.3d 1071, 1072 (9th Cir. 2011) (citing *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). The same factors guide the issuance of a preliminary injunction. *See Winter*, 555 U.S. at 20.[1] The burdens of proof and persuasion are on the inmate seeking injunctive relief, not on the government, and the inmate must carry that burden "*by a clear showing*." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997).

[1] Although Mitchell used both the terms "stay" and "enjoin" below (CR 606), the relief he requested is properly considered an injunction, not a stay, because he challenges the manner in which the execution will be carried out rather than the death sentence itself. *See Nken v. Holder*, 556 U.S. 418, 428 (2009); *Hill*, 547 U.S. at 580.

## I. Mitchell Does Not Show a Significant Possibility of Merits Success

"A federal court will only grant a stay of execution where the inmate seeking the stay can show a significant possibility of success on the merits." *Moormann v. Schriro*, 672 F.3d 644, 647 (9th Cir. 2012); *see Hill*, 547 U.S. at 584. Indeed, the Supreme Court has deemed it an abuse of discretion to enjoin an execution without finding a likelihood of success on the merits. *See Dunn v. McNabb*, 138 S. Ct. 369 (2017) (mem.); *see also Lee*, 2020 WL 3964985, at *1 (vacating injunction of federal executions because the inmates had "not established that they are likely to succeed on the merits of their" claim). Here, Mitchell does not make the requisite showing because he fails to impeach the district court's conclusion that the federal protocol does not conflict with relevant Arizona law for purposes of the FDPA.

As relevant here, the FDPA directs that "a United States marshal . . . shall supervise implementation of the [death] sentence in the manner prescribed by the law of the State in which the sentence is imposed." 18 U.S.C. § 3596(a). In concluding that the federal protocol does not offend this law, the district court relied on the D.C. Circuit's rejection of similar claims by death-row inmates (in litigation that Mitchell previously joined and then departed) as "without merit." *In re Fed. Bureau of Prisons' Execution Protocol Cases*, 955 F.3d 106, 112 (D.C. Cir. 2020) (per curiam) ("*Protocol Cases*"). The Supreme Court denied an application to stay those inmates' executions pending further review of their FDPA claims, and the

executions proceeded. *See Bourgeois v. Barr*, No. 19A1050, 2020 WL 3492763 (U.S. June 29, 2020). The district court correctly concluded that Mitchell provides no reason for a different result here.[2]

### A. Mitchell Does Not Undermine the District Court's Conclusion that the Federal Execution Protocol Is Consistent with the FDPA

As the district court explained, the judges in the D.C. Circuit majority rejected the inmates' FDPA claims based on different readings of the statute. Judge Katsas concluded "that the FDPA regulates only the top-line choice among execution methods, such as the choice to use lethal injection instead of hanging or electrocution," while Judge Rao concluded that it "also requires the federal government to follow execution procedures set forth in state statutes and regulations, but not execution procedures set forth in less formal state execution protocols." *Protocol Cases*, 955 F.3d at 112 (per curiam). The district court adopted the more generous reading of the FDPA articulated by Judge Rao, concluding that "only those execution procedures actually prescribed by state law—state statutes and regulations

[2] Mitchell incorrectly states that the Supreme Court in December 2019 "upheld" the preliminary injunction entered by the district court in November 2019. (Mot. at 3, 7, 14.) The Supreme Court did not endorse that injunction in any way. It merely declined the government's request to stay or vacate the injunction at that time, while three Justices predicted (accurately) that the government was "very likely to prevail" on appeal on the FDPA claim when it was decided. *Barr v. Roane*, 140 S. Ct. 353, 353 (2019) (Statement of Alito, J.). The Court then allowed those executions to proceed without further review. The Court's handling of the other inmates' FDPA claim thus cuts sharply against Mitchell, rather than supporting him.

that have the force and effect of law—must be applied in a federal execution." (CR 618 at 10-12.)

Even under that more generous reading of the FDPA, the district court concluded that Mitchell's claim fails. Like Judge Rao, the district court reasoned that only "binding law prescribed through formal lawmaking procedures" can be described as a manner that has been "prescribed by the law of the State" for purposes of the FDPA. (CR 618 at 10-12 (quoting *Protocol Cases*, 955 F.3d at 132-34 (Rao, J., concurring).) And the court explained that the only differences between the federal protocol and the execution procedures entrenched in Arizona statutes and regulations are "not the kinds of procedures incorporated by the FDPA" because they are "matters unrelated to the procedures for effectuating death." (CR 618 at 15-16.) The court observed that "even Judge Tatel," who adopted an even broader reading of the FDPA, "found that § 3596(a) requires the federal government to follow only 'those procedures that effectuate the death, including choice of lethal substances, dosages, vein-access procedures, and medical-personnel requirements.'" (CR 618 at 16 (quoting *Protocol Cases*, 955 F.3d at 151 (Tatel, J., dissenting).) The court added that the Seventh Circuit has read the FDPA in the same way. (*Id.* (citing *Peterson v. Barr*, 965 F.3d 549, 554 (7th Cir. 2020).)

Although the government submits that the better reading of the FDPA incorporates only states' top-line method of execution, *see infra* Section I.B, this

Court need not resolve that issue, because Mitchell fails to refute the district court's conclusion that his claims fails even under the more generous interpretation of the FDPA adopted by Judge Rao. Indeed, given that Mitchell hardly engages with the district court's analysis, he falls well short of, "*by a clear showing*, carr[ying] the burden of persuasion." *Mazurek*, 520 U.S. at 972.

*First*, as the district court explained, Arizona's execution statute, A.R.S. § 13-757(A), includes no specific procedures, but instead requires only use of some form of lethal injection. Arizona's execution protocol appears in a "department order" issued by the Director of the Arizona Department of Corrections (ADOC). (CR 606-3 (Order 710).) "Rules made by the state department of corrections" are expressly exempted from formal agency rulemaking, A.R.S. § 41-1005(22), just as Director's Orders "are not included in the Arizona Administrative Code" (CR 618 at 13 n.7). The district court noted that "Mitchell addresses none of this," and specifically "never addresses Arizona administrative law concerning agency rulemaking, such as the Arizona Administrative Procedures Act, A.R.S. § 41-1001, *et seq.*" (*Id.*) Mitchell's continued silence on the subject in the present motion defeats his ability to carry the burden of persuasion.

*Second*, Mitchell's assertion that Order 710 is Arizona "law" because the Director entered into a stipulated settlement agreement in a lawsuit brought by state inmates is not persuasive. As the district court explained, the settlement agreement

"is a contract, not a statute or formal regulation," "says nothing about creating Arizona law," and "Mitchell cites no authority for the proposition that a settlement agreement between litigants creates Arizona law." (CR 618 at 13-14.) Mitchell likewise fails to cite any such authority now, again defeating his motion.

Indeed, the Director was able to enter into such a stipulation precisely because the protocol can be revised *without* "formal lawmaking procedures." *Protocol Cases*, 955 F.3d at 132 (Rao, J., concurring). If the parties to that case wanted, a different settlement agreement could be entered tomorrow, again without formal lawmaking procedures. Thus, Mitchell's argument that the protocols are law because they are "binding" misses the mark. Many things are "binding" but not "law." Every contract is the former but not the latter.

Citing *United States v. Rodriquez*, 553 U.S. 377 (2008), Mitchell asserts that "something is 'prescribed by law' when it includes binding requirements." (Mot. at 13.) But *Rodriquez* does not say this. That case held that under a different federal statute, the maximum term of imprisonment prescribed by law included recidivist enhancements in state *statutes*. *See* 553 U.S. at 382 (holding "[t]he relevant 'law' is set out in" relevant sections of the Washington Revised Code). Indeed, *Rodriquez*'s author is the same Justice who stated that the United States is "very likely to prevail" in its view that the FDPA requires nothing more than the top-line method of lethal injection. *Barr v. Roane*, 140 S. Ct. 353, 353 (2019) (Statement of Alito, J.).

The notion that the Director of the ADOC could unilaterally create "the law of the State," 18 U.S.C. § 3596(a), is particularly dubious in Arizona, which is governed by one of the strongest separation-of-powers provisions of any state constitution. *See* Ariz. Const. art. III. Under that provision, "[t]he legislature has the exclusive power to declare what the law shall be." *State ex rel. Woods v. Block*, 189 Ariz. 269, 275, 942 P.2d 428, 434 (1997) (quotation omitted). "In contrast, the executive branch's duty is to carry out the policies and purposes declared by the Legislature," and the "separation of power between the branches of government requires that 'those who make the law be different from those who execute and apply it.'" *Id.* (citation and quotation omitted).

In short, nothing about Order 710 qualifies as Arizona "law." 18 U.S.C. § 3596(a). Nor does Mitchell provide any basis for disturbing the district court's conclusion—which relied not only on Judge Rao's position, but also on Judge Tatel's dissenting view and the unanimous position of the Seventh Circuit—that the requirements of Arizona "law" that differ from the federal protocol are not incorporated by the FDPA because they do not relate to the manner of effectuating death. (CR 618 at 15-16.) Thus, even assuming the FDPA requires adherence to more than a state's method of execution under the more generous reading adopted by the district court and Judge Rao, Mitchell cannot establish that the federal protocol is inconsistent with Arizona's law governing the manner of executions.

As explained further below, Mitchell's contrary view would produce the implausible result that the federal government is bound by minor details of state execution protocols that even the states themselves need not follow and that have nothing to do with actually implementing a sentence of death. Mitchell's view would also mean that every execution under the FDPA, including the three the Supreme Court allowed to proceed last month, was unlawful. Indeed, Mitchell fails to identify any federal execution in the history of the United States that has been conducted under his view that the federal government must comply with all details of state execution procedures. The district court correctly concluded that his strained interpretation lacks merit and does not provide a basis for staying his execution.

### B. The Court Could Affirm on the Alternative Ground that the FDPA Requires Only that BOP Execute Mitchell by Lethal Injection

Although this Court need not adopt a definitive interpretation of the FDPA given that Mitchell cannot succeed even under the *more generous* reading adopted by the district court and Judge Rao, the better reading of the statute is the one adopted by Judge Katsas and strongly suggested by the three Justices that have addressed the question: the FDPA's reference to "'manner' refers only to the method of execution," and thus "the FDPA regulates only the top-line choice among execution methods such as hanging, electrocution, or lethal injection." *Protocol Cases*, 955 F.3d at 113 (Katsas, J., concurring); *see Roane*, 140 S. Ct. at 353 (Statement of Alito, J.). As those Justices observed, this view is supported by "the ordinary meaning of"

the terms "manner" and "method," as well as "the use of the term 'manner' in prior federal death penalty statutes." *Roane*, 140 S. Ct. at 353 (Statement of Alito, J.).

All agree that the federal "manner" of execution statute traces back to the Crimes Act of 1790. That Act provided that for federal capital crimes, "the manner of inflicting the punishment of death, shall be by hanging the person convicted by the neck until dead." Crimes Act of 1790, ch. 9, § 33, 1 Stat. 112, 119. (CR 611-1.) Thus for most of our nation's history, the law defining the "manner" of a capital sentence unambiguously referred only to the choice among methods (hanging) and had nothing to do with granular procedures. In 1937, Congress amended the statute, transplanting "the manner of inflicting the punishment of death," but deleting "hanging" and substituting "the manner prescribed by the laws of the State within which the sentence is imposed." Pub. L. No. 75-156, 50 Stat. 304. (CR 611-2.)

The parties disagree about how to interpret the change, but the reading most consistent with the statutory text and history is that the 1937 Act merely substituted one source for determining the prescribed "manner" of execution (the manner prescribed by the law of the State) for another (the manner prescribed by Congress), without changing the meaning of "manner" itself. The Supreme Court has frequently explained that "if a word is obviously transplanted from another legal source, whether the common law or other legislation, it brings the old soil with it." *Hall v. Hall*, 138 S. Ct. 1118, 1128 (2018) (quotation omitted). Likewise, courts do

not infer substantial statutory changes without clear language; courts instead read ambiguous changes narrowly. *See United States v. Ryder*, 110 U.S. 729, 739-40 (1884); *Schmidt v. United States*, 133 F. 257, 259-60 (9th Cir. 1904).

The history of the 1937 update confirms that it had nothing to do with incorporating granular state procedures into federal law. Rather, "[t]he changes in the statute from [the 1790] language to the present [1937] language were prompted by the fact that 'Many States . . . use(d) more humane *methods* of execution, *such as electrocution, or gas*" and "it appear(ed) desirable for the Federal Government likewise to change its law *in this respect*." *Andres v. United States*, 333 U.S. 740, 745 n.6 (1948) (quoting H. Rep. No. 164, 75th Cong., 1st Sess., 1 (1937)) (emphases added). The statutory amendment, moreover, was proposed by the Attorney General and signed by President Roosevelt, who had no reason to surrender to the States broad decision-making power in executing federal sentences for federal crimes.

The district court acknowledged that this history supports the government's interpretation. (CR 618 at 7 (recognizing that "this view has some merit").) But the district court ultimately reasoned that the 1937 Act "contemplated at least the possibility of a wholesale use of state execution procedures" by permitting the federal government to pay states to use their facilities, as it often (though not universally) did under the 1937 Act. (*Id.*) The government respectfully disagrees because Congress's creation of an option for federal officials to use state facilities

speaks only to where federal executions could occur, not the manner in which they must be carried out. An interpretation suggesting that the *place* of the execution must dictate the *procedures* employed in the execution would make little sense under the statutory text and structure, which refers to a single "manner" of execution but provides a choice between state and federal facilities. Indeed, the FDPA's provision that the federal government "may" use state facilities would effectively be rendered superfluous if the statute already required the federal government to follow state procedures, which themselves typically require the use of state facilities, personnel, and resources. *See* 18 U.S.C. § 3597(a).

Critically, Mitchell has produced no evidence that the government bound itself to state execution procedures even when it paid states to use their facilities. To the contrary, the Bureau of Prisons' 1942 Manual of Policies and Procedures, pursuant to which federal executions were carried out under the 1937 Act, explains that the "manner" provision "refers to the *method* of imposing death, whether by hanging, electrocution, or otherwise, and *not to other procedures* incident to the execution prescribed by the State law." (CR 611 Ex. F (emphases added).) The Manual further states that the U.S. Marshal "shall be in direct charge of the conduct of executions, subject to the procedures herein set forth and to any supplemental instructions issued by the Department of Justice," and set forth controlling regulations to be followed in carrying out federal executions. (*Id.*) The district court

declined to afford weight to the 1942 Manual, finding it is not evidence of actual "practice." (CR 618 at 8.) But there is no reason to suspect that BOP promulgated unambiguous procedures it did not follow in practice. Courts "assume agencies follow their own regulations," *Friends of Earth, Inc. v. E.P.A.*, 446 F.3d 140, 148 (D.C. Cir. 2006), and Mitchell has provided no evidence to the contrary.

Mitchell's position that the FDPA requires the execution "to go forward in the exact same way that it would in Arizona" (Mot. Ex. 1 at 21) also has practical consequences that Congress could not plausibly have intended. His interpretation would impose on the federal government the burden of complying with dozens of different requirements in state execution protocols, which may be impossible because of secrecy provisions, outdated protocols, or obstructionism by state officials. *See Roane*, 140 S. Ct. at 353 (Statement of Alito, J.). Indeed, under Mitchell's view, the federal government could prosecute a defendant for a federal crime, obtain a conviction and death sentence from a federal court, detain the inmate in federal prison, and yet have the federal execution thwarted by a mid-level state prison official who makes it impossible to comply with a state protocol. No reason exists to read the Federal Death Penalty Act to permit such a counterintuitive result.

Mitchell suggests that the FDPA should be read to depart from the 1790 and 1937 Acts because the FDPA refers to "implementation" of the sentence, rather than "inflicting" it. The district court, however, correctly rejected that view. (CR 618 at

9 (reasoning the FDPA "return[ed] to the 1937 model").) And the FDPA's reference to "implementation" is fully consistent with the top-line choice of execution method. Although Mitchell suggests that implementation necessarily involves decisions on a variety of matters, his own proposed definition also includes a singular "act or instance of implementing something." *See* https://www.merriam-webster.com/dictionary/implementation. In any event, the issue is not what "implementation" could mean in the abstract, but rather what term it modifies in the FDPA ("manner").

Mitchell also claims that "manner" means more than "method." (CR 606 at 5.) But that is difficult to square with term's origin in the 1790 Act, where it indisputably referred only to the method (hanging). And many dictionaries, including those contemporaneous to both the 1790 Act and the FDPA, confirm that "manner" is synonymous with "method." *See Protocol Cases*, 955 F.3d at 114-15 (Katsas, J., concurring) (collecting dictionary definitions).[3]

The district court also relied on a letter Attorney General Janet Reno sent to Congress in 1994 reflecting concerns about the FDPA "'contemplat[ing] a return to an earlier system in which the Federal Government does not directly carry out

[3] Judge Katsas also explains why, like most words, "manner" in different statutes can mean different things. For instance, the word's use in 18 U.S.C. § 3592(c)(6), cited by Mitchell below, arose from a separate context, the Anti-Drug Abuse Act of 1988, enacted almost two centuries after the federal manner of execution statute. *See Protocol Cases*, 955 F.3d at 122 (Katsas, J., concurring).

executions, but makes arrangements with states to carry out capital sentences in Federal cases.'" (CR 618 at 9 (citing H.R. Rep. No. 104-23, at 22 (1995)).) Contrary to the court's conclusion, however, that letter does not indicate that the federal government believed it had to follow state procedures under the FDPA. Rather, the letter reveals a very real concern at the time: the federal government's inability to implement death sentences by *methods* other than lethal injection, such as electrocution, which a number of states still required. It could not possibly have meant that the federal government was prohibited from conducting executions in federal facilities with federal personnel, since, as all concede, the federal government did carry out some executions in federal facilities under the 1937 Act, and like that Act, the FDPA permits but does not require the federal government to borrow state resources for these purposes. 18 U.S.C. § 3597(a).[4]

In summary, the statutory interpretation adopted by Judge Katsas and strongly suggested by the three Justices who have addressed the question is the most

---

[4] Mitchell also pointed to failed legislative proposals to amend the FDPA (CR 606 at 8-9), but "failed legislative proposals are a particularly dangerous ground on which to rest an interpretation of a prior statute." *Cent. Bank of Denver v. First Interstate Bank of Denver*, 511 U.S. 164, 187 (1994) (quotation omitted). *See Protocol Cases*, 955 F.3d at 122 (Katsas, J., concurring). Moreover, when the FDPA was adopted, ten states authorized the death penalty exclusively by method of electrocution. *See* Office of Justice Programs, U.S. Dep't of Justice, Capital Punishment 1994, at 5 Table 2 (Feb. 1996), *available at* https://www.bjs.gov/content/pub/pdf/cp94.pdf. The Justice Department's support for amending the FDPA ceased shortly before the last death-penalty state authorized lethal injection. *See Baze v. Rees*, 553 U.S. 35, 43 n.1 (2008) (plurality op.).

persuasive. The FDPA traces back to Section 33 of the 1790 Act, which, in the specific context of federal executions, used “manner” to refer only to the top-line choice of method. Congress transplanted the same operative language into the 1937 Act and then the FDPA, thereby retaining its original meaning, which for present purposes requires only lethal injection. This alternative basis for Mitchell’s failure on the merits also justifies denying relief.

## II. The District Court’s Denial of Injunctive Relief Can Independently Be Affirmed on Equitable Grounds

Because this Court directed the parties’ briefing to focus on the “merits of [Mitchell’s] appeal” (Dkt. 7), the United States has focused this response on Mitchell’s inability to establish a likelihood of success on the merits of his FDPA claim. Importantly, however, the “merits” of Mitchell’s appeal from the denial of injunctive relief also include whether the equities support such relief. The Supreme Court has made clear that the entry of an injunction is impermissible absent a finding that irreparable harm is “*likely*,” not just possible, and “[a] proper consideration of” the remaining equitable factors. *Winter*, 555 U.S. at 20-24. Those factors independently support the district court’s decision not to enter Mitchell’s requested injunctive relief. *See Protocol Cases*, 955 F.3d at 126-129 (Katsas, J., concurring) (explaining that injunctive relief was unwarranted on equitable grounds alone).

Mitchell makes no showing of likely real-world harm from following the federal protocol. Given his inability to challenge his death sentence itself, *see supra*

p.3 n.1, he cannot invoke his execution as the harm at issue here. Rather, any cognizable harm must stem from the difference between execution under the federal and Arizona protocols, even though they both use five grams of a single-drug, pentobarbital. (CR 606 Ex. C.) As demonstrated by his own list (CR 606 at 9-11), any such differences are minor, and Mitchell identifies no way in which they are likely to inflict actual, non-speculative harm during his execution. That is particularly true since the federal protocol does not prohibit what the Arizona protocol requires in terms of matters like personnel training and venous access; it just does not include the same level of detail.

Moreover, Mitchell's decision to delay this challenge to federal protocol procedures until shortly before his scheduled execution weighs heavily against affording him relief. While the Supreme Court has permitted method-of-execution challenges to proceed outside the limitations on habeas actions, it has specifically recognized "a strong equitable presumption against the grant of a stay where a claim could have been brought at such a time as to allow consideration of the merits without requiring entry of a stay." *Hill*, 547 U.S. at 584. And the Court has expressly instructed courts to "police carefully against attempts to use such challenges as tools to interpose unjustified delay" given that "[b]oth the [government] and the victims of crime have an important interest in the timely

enforcement of [a capital] sentence." *Bucklew*, 139 S. Ct. at 1133-34; *see Lee*, 2020 WL 3964985, at *2.

Those instructions counsel strongly against Mitchell's request for relief. The asserted legal defects in the federal government's approach to executions have been present since Mitchell's conviction in 2003, and Mitchell's suggestion that he could not challenge the protocol until his execution date had been scheduled or rescheduled (Mot. at 18-19) is contradicted by his own previous participation in the D.C. protocol litigation long before his execution was scheduled in the first place. *See Robinson v. Mukasey*, No. 07-CV-02145 (D.D.C.), Dkt. 11. Mitchell withdrew from that suit, failed to re-join it even after the government announced its revised protocol in July 2019 and scheduled his execution, and brought this challenge in his court of conviction (rather than as an APA suit, as he had previously) only after the D.C. Circuit rejected his view of the FDPA. *See id.*, Dkt. 20.[5]

Last month, the Supreme Court reiterated that last-minute reprieves in capital cases should be an "extreme exception," *Lee*, 2020 WL 3964985, at *2 (citation omitted), and summarily reversed three separate injunctions and a fourth stay in the span of a week to allow three federal executions to proceed. The Court had also

[5] Mitchell's emergency motion in the court of conviction twenty days before his execution is procedurally unprecedented, and would evade the limits of an APA action, habeas, and the holdings of the D.C. and Seventh Circuits. Mitchell's failure to establish that he is procedurally entitled to file such a motion in the court of conviction counsels caution in resolving substantive issues in this fashion.

denied a stay application based on the same FDPA claim that Mitchell raises here. In light of those decisions and the equitable factors discussed above, Mitchell falls well short of establishing an entitlement to a last-minute reprieve.

## CONCLUSION

For the foregoing reasons, the motion should be denied.

MICHAEL BAILEY
United States Attorney
District of Arizona

KRISSA M. LANHAM
Appellate Division Chief

*s/ William G. Voit*
WILLIAM G. VOIT
Assistant U.S. Attorney

## CERTIFICATE OF COMPLIANCE

Pursuant to Circuit Rule 27-1(1)(d), I certify that the foregoing response does not exceed 20 pages.

August 16, 2020
Date

*s/ William G. Voit*
WILLIAM G. VOIT
Assistant U.S. Attorney

## CERTIFICATE OF SERVICE

I hereby certify that on this 16th day of August, 2020, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

*s/ William G. Voit*
WILLIAM G. VOIT
Assistant U.S. Attorney