CA No. 20-99009

IN THE UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

LEZMOND CHARLES MITCHELL,

Defendant-Appellant.

DC No. 3:01-cr-01062-DGC
(Civil No. 3:09-cv-08089-DGC)

**DEATH PENALTY CASE**

**Emergency Motion Under Circuit Rule 27-3(b)**

**Execution Set For: August 26, 2020 at Time: To Be Determined.**

# APPELLANT'S REPLY IN SUPPORT OF EMERGENCY MOTION TO STAY EXECUTION

APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF ARIZONA

The Honorable David G. Campbell
United States District Judge

CUAUHTEMOC ORTEGA
Interim Federal Public Defender
JONATHAN C. AMINOFF
Jonathan_Aminoff@fd.org
CELESTE BACCHI
Celeste_Bacchi@fd.org
Deputy Federal Public Defenders
321 East 2nd Street
Los Angeles, California 90012-4202
Tel: (213) 894-5374; Fax: (213) 894-0310
Attorneys for Petitioner-Appellant
LEZMOND CHARLES MITCHELL

# TABLE OF CONTENTS

**Page(s)**

I. ARGUMENT....................1

A. The Court Need Not Follow Judge Rao's Decision....................1

B. Under Judge Rao's Analysis, Mitchell's Motion Should Be Granted....................4

C. Mitchell's Motion is Timely. ....................9

# I. ARGUMENT

## A. The Court Need Not Follow Judge Rao's Decision

The court below adopted Judge Rao's analysis in *In re Federal Bureau of Prisons' Execution Protocol Cases* ("*Protocol Cases*"), 955 F.3d 106, 129-46 (D.C. Cir. 2020) (Rao, J. concurring). While Mitchell contends that he is entitled to relief even under Judge Rao's reasoning, *see infra* at 4-10, this Court is not bound to follow her approach, which was based on a view that had not been advanced by the plaintiffs nor addressed by the district court, and in fact had been expressly *rejected* by the Government. *Protocol Cases*, D.C. Cir Case No. 19-5322, Dkt. 1823754 (Gov't Reply at 11-15 rejecting as "absurd" any interpretation of § 3596 requiring more than a top-line nod to a state's execution method).

The more judicious approach, one supported by the FDPA's text, history, and purpose, is to follow the reasoning of Judge Tatel, who reads the FDPA to "require[] federal executions to be carried out using the same procedures that states use to execute their own prisoners—procedures set forth not just in statutes and regulations, but also in protocols issued by state prison officials pursuant to state law." *Protocol Cases*, 955 F.3d 106, 146 (D.C. Cir. 2020) (Tatel, J., dissenting). As Judge Tatel rightly held, the federal government is obligated to follow a state's protocols regardless of "the happenstance of . . . where the state chose to write

[them] out." *Id.* at 148 (quoting the Government's argument, *see* D.C. Circuit Case No. 19-5322, Oral Arg. Rec. 39:12-32).

The history of the FDPA, and indeed the history of federal executions in this country, is key to understanding Judge Tatel's analysis. Taking a life is the "most extreme sanction available," *Atkins v. Virginia*, 536 U.S. 304, 319 (2002). And it is without question that the States have far more experience in levying that sanction than the federal government. That is why, in 1937, Congress created a federalist scheme: It mandated that with respect to death sentences imposed under the few then extant federal capital offenses, "the manner of inflicting the punishment of death shall be the manner prescribed by the laws of the State within which the sentence is imposed." An Act to Provide for the Manner of Inflicting the Punishment of Death § 323, 50 Stat. 304, 304 (June 19, 1937). Congress specifically passed the 1937 Act because states were endeavoring to make executions more humane. *See* H.R. Rep. 75-164 at 2 (1937). Accordingly, "nearly all executions conducted under the 1937 statute took place in state facilities," presumably in accordance with state protocols. *Protocol Cases*, 955 F.3d at 137 (Rao, J., conc.) (internal citations omitted).

Upon enactment of the Sentencing Reform Act of 1984, Congress repealed Section 3566, and for a number of years there were no specific provisions in federal law specifying the manner by which executions would be carried out.

Then, effective February 18, 1993, the Attorney General of the United States promulgated regulations providing that "[e]xcept to the extent a court orders otherwise, a sentence of death shall be executed . . . [b]y intravenous injection of a lethal substance or substances in a quantity sufficient to cause death." 58 Fed. Reg. 4898, 4901-02 (1993) (codified at 28 C.F.R. § 26.3). Notably, when Congress passed the FDPA, it reinstated the federalist scheme of the 1937 Act by adopting the language of the 1937 statute rather than incorporating the 1993 federal regulation governing federal executions. *See* 18 U.S.C. § 3596 (USMS "shall supervise implementation of the sentence in the manner prescribed by the law of the State in which the sentence is imposed"). Then-Attorney General Reno warned that § 3596(a)'s "proposed procedures contemplate a return to [the system authorized by the 1937 Act] in which the Federal Government does not directly carry out executions, but makes arrangements with state to carry out capital sentences in Federal cases." H.R. Rep. No. 104-23, at 22 (1995). Accordingly, DOJ recommended an amendment to the law that would allow federal executions to be "carried out . . . pursuant to uniform regulations issued by the Attorney General." *Id.* This amendment was not adopted.

Thus, had Congress intended to authorize the Attorney General to adopt a uniform protocol, it was certainly on notice and knew exactly how to do so, but it chose not to. On nine occasions since the passage of the FDPA, Congress has

considered and failed to pass bills that would have provided for federal executions to be carried out pursuant to regulations prescribed by the Attorney General.[1] When Congress decides not to pursue a "known and readily available approach," that choice "must be given effect rather than disregarded." *SAS Institute, Inc. v. Iancu*, 138 S. Ct. 1348, 1355 (2018). Moreover, reading § 3956(a) to exclude state execution protocols is contrary to Congressional intent, which sought to ensure more humane executions by deferring to the expertise of states with regard to executions by requiring federal prisoners to be executed in the same manner as states execute their own. The Government claims that Judge Tatel's (and Mitchell's) reading of the legislative history risks "counterintuitive result[s]," D.E. 9 at 14. But in fact, it is the Government's argument that "manner" only means a state's top-line method of execution that is counterintuitive to the FDPA's text, history, and intent.

## B. Under Judge Rao's Analysis, Mitchell's Motion Should Be Granted

In adopting Judge Rao's concurrence, the district court concluded that in order to comply with § 3596, the federal government need only follow Arizona's

---

[1] *See* H.R. 2359, 104th Cong. § 1 (1995); H.R. 851, 110th Cong. § 6 (2007); H.R. 3156, 110th Cong. § 126 (2007); S. 1860, 110th Cong. § 126 (2007); H.R. 5040, 109th Cong. § 6 (2006); S. 899, 106th Cong. § 6504 (1999); H.R. 4651, 105th Cong. § 501 (1998); S. 3, 105th Cong. § 603 (1997); H.R. 1087, 105th Cong. § 1 (1997).

death penalty statutes, which address only the method of execution (Ariz. Rev. Stat. § 13-757), and Arizona's criminal rules. Dkt. 618 at 10, 12, 15. Although Arizona has an established lethal injection protocol applicable to everyone sentenced to death within the state's borders, the district court holds that the protocol does not bind the Government because rules made by the Arizona Department of Corrections are exempted from the formal agency rulemaking process. This conclusion is contrary to law.

When defining what § 3596 meant when referring to "law of the state," neither Judge Rao nor the district court considered the term in the context of the statute. This is a fatal flaw in their analysis. In *United States v. Howard*, the Court examined the statute, and its history and purpose, before concluding that the phrase "law of the State" in the Black Bass Act included state administrative orders, even though it could not be "ascertained from the record" whether the order followed state procedures. 352 U.S. 212, 216-219 (1957). And in *Baze v. Rees*, 553 U.S. 35, 44-45, 51 (2008) (plurality opinion), the Court treated execution procedures as a creation of "state legislatures" when they were issued by a state agency, even without notice and comment, pursuant to legislative delegation.

Regardless, Arizona has a formal lethal injection protocol that applies to everyone sentenced to death within the state. Although the district court dismissed the stipulation between the Attorney General and the state's death row inmates as

merely a contract (dkt. 618 at 14), the stipulation at issue creates legally enforceable rights, which effectively give the protocol the force of law. For example, executions in Arizona, in accordance with the protocol, are conducted with a single drug whereby the inmate is administered a massive dose of either pentobarbital or sodium pentothal. Dkt. 606-3 at 34. If the Arizona Department of Corrections ("ADC") Director proposes to execute the inmate via injection of midazolam, under the settlement agreement, the inmate would have the legally enforceable right to have the execution enjoined and require that the execution be conducted in accordance with the protocol. Dkt. 606-4 at 43 (Covenant 4: "ADC Director's discretion to choose the quantities and types of chemicals for an execution shall be limited to the quantities and types of chemicals set forth expressly in the then-current execution procedures; that the quantities or types of chemicals that may be used in an execution may be modified only through the formal publication of an amended set of execution procedures) and at 45 (stating that the stipulated settlement agreement binds the ADC). Whether the acceptable drugs are listed in a criminal rule or a formal execution protocol is a distinction with no significance. And the fact that a settlement agreement could conceivably be changed, just as a state rule or law might be, similarly has no significance.

This analysis is consistent with Judge Rao's approach. As Judge Rao explained, "execution protocols tend to be informal and non-binding," and "[a]

state execution protocol that explicitly allows the department of corrections to depart from the protocol's requirements on a case-by-case basis cannot be said to be binding." *Protocol Cases*, 955 F.3d at 142-43. However, that is not the case here, as the stipulation explicitly provides that the execution protocols are now binding upon Arizona state officials. Dkt. 606-4 at 45. Indeed, one of the purposes of the stipulation was to severely limit the ADC Director's discretion in changing portions of the protocol's requirements. In the past, the ADC Director was able to change any time frame within the protocol. Pursuant to Covenant 2 of the settlement agreement, however, the ADC Director may now only change timeframes when those specific timeframes "correspond to minor or routine contingencies not central to the execution process." Dkt. 606-4 at 42, *see generally* Dkt. 606-4 at Covenants 1, 3-7 (all limiting the ADC Director's discretion).

The BOP's procedures, as stated in its protocol and addendum, differ substantially from Arizona law with regard to how the execution must be implemented. Although the Government scoffs at the differences between the Arizona protocol and DOJ's protocol (D.E. 9 at 1), these details help to reduce the risk of unconstitutional pain and suffering. Indeed, Arizona's current lethal injection protocol replaced the version that was used in the indisputably botched execution of Joseph Wood that took over 2 hours to complete. The Government, however, continues to use the BOP protocol that, just last month, resulted in

Wesley Purkey suffering from flash pulmonary edema and essentially drowning to death. *Protocol Cases*, D. D.C. 19-MC-145, Dkt. 183 at 1-4. As Congress' stated goal in deferring to the state's manner of execution was to ensure more humane executions, it is consistent with Congress' efforts to ensure that the Government follow the carefully drafted Arizona protocol, variations of which this Court has judicially reviewed in detail on numerous occasions.

Some of the most significant differences include:

- **Qualifications for placing IVs:** Arizona law requires that members of the IV team be certified in the U.S. to place IV lines; the BOP protocol does not. Poorly trained personnel are likely to improperly insert a needle or have difficulty with venous access; (Dkt. 606-3 at 013; 606-1 at 3);
- **IV access:** Arizona law allows only for peripheral IV catheters or a central femoral line placed by someone qualified to do so; BOP's protocols allow "the Director or designee [to] determine the method of venous access"; (606-3 at 014; 606-1 at 4);
- **Expiration of lethal-injection drugs:** Arizona law specifies that any chemical used in an execution must have an expiry date after that of the execution; BOP's protocols have no such requirement, thus increasing the risk that the drugs will lose efficacy and cause actual harm; (606-3 at 033; 606-1);
- **Disclosure of manufacture of lethal-injection drugs:** Arizona law requires disclosure to the inmate and counsel at the time a warrant is sought "The decision to use a compounded or non-compounded chemical"; BOP's protocols have no such disclosure requirement; (606-3 at 034; 606-1);

- **Testing of lethal-injection drugs:** Arizona law requires disclosure of a "quantitative analysis of any compounded or non-compounded chemical to be used in the execution" within ten days of seeking a warrant; BOP's protocols have no testing or disclosure requirement; (606-3 at 034; 606-1); and

These significant differences mean that the BOP's stated intention to execute Mitchell pursuant to the BOP protocol would not constitute an execution implemented in the manner prescribed by Arizona law.

### C. Mitchell's Motion is Timely.

The Government argues that Mitchell delayed in filing this motion. The district court rejected this argument. Dkt. 618 at 3-4. This Court should do the same. In support of its argument, the Government cites to Mitchell's involvement in a lethal injection suit filed in the District Court for the District of Columbia. D.E. 9 at 19. The Government omits, however, that at all times during Mitchell's involvement in that suit, the suit was "effectively stayed pending the Bureau of Prisons' completion of its re-evaluation and revision of its present lethal injection protocol." *Robinson v. Mukasey*, No. 07-CV-2145 (D.D.C.) at Dkt. No. 9 (Joint Status Report). This suit, and the other related suits, did not become active again until July 25, 2019 when the Government suddenly announced it had created a lethal injection protocol and scheduled 5 inmates' executions, including Mitchell,

who had already withdrawn from the suit over a year earlier.[2] *Id*. at Dkt. No. 20. As this Court is well aware, the Government prematurely sought to execute Mitchell, and this Court issued a stay of execution because of his pending appeal. *Mitchell v. United States*, Ninth Circuit Case No. 18-17031, at D.E. 26. When Mitchell's execution was cancelled, the Government was not in violation of the trial court's sentencing order, and the issue was not ripe. But once Mitchell received a new execution date, he promptly raised this issue with the district court. The Government's complaints about the proximity of Mitchell's motion to his execution date is entirely a function of the Government only giving Mitchell 28 days' notice of his execution, and should not count against Mitchell.

For the foregoing reasons, the Court should stay Mitchell's execution and grant appropriate relief.

Respectfully submitted,

CUAUHTEMOC ORTEGA
Interim Federal Public Defender

DATED: August 17, 2020 By */s/ Jonathan C. Aminoff*
JONATHAN C. AMINOFF
CELESTE BACCHI
Deputy Federal Public Defenders

Attorney for Defendant-Appellant
LEZMOND CHARLES MITCHELL

[2] Mitchell's pro se dismissal was granted without a formal waiver.